# IN THE SUPREME COURT OF TEXAS

════════════
No. 13-0552
════════════

SHELL OIL COMPANY AND SHELL INTERNATIONAL, E&P, INC., PETITIONERS,

v.

ROBERT WRITT, RESPONDENT

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued November 6, 2014**

JUSTICE JOHNSON delivered the opinion of the Court.

In this defamation action we consider whether the providing of a report regarding possible criminal activity to a government agency was an absolutely privileged communication or a conditionally privileged one.

Shell Oil Company and Shell International, E&P, Inc. (collectively, Shell) received an inquiry from the Department of Justice (DOJ) regarding possible violations of the Foreign Corrupt Practices Act by one of its contractors. Shell met with the DOJ, agreed to perform an internal investigation and report the results to the DOJ, and then did so. Robert Writt, who was employed by Shell until his employment was terminated following the investigation, sued Shell for wrongful termination and for defamation. Writt's defamation claim was based on Shell's furnishing the DOJ its report that contained allegedly defamatory statements about him. Shell asserted that it was absolutely privileged

to provide the report to the DOJ and moved for summary judgment. The trial court granted Shell's motion; the court of appeals reversed.

We conclude that Shell's statements were made preliminarily to a proposed judicial proceeding and were absolutely privileged. Accordingly, we reverse the judgment of the court of appeals.

## I. Background

In February 2007 a Shell contractor, Vetco Gray, entered into a plea agreement with the DOJ under which Vetco Gray was criminally convicted and fined $26 million for violating the Foreign Corrupt Practices Act (FCPA). 15 U.S.C. §§ 78dd-1 to -2 (1998). Vetco Gray pled guilty to paying bribes to Nigerian customs officials through Panalpina, Inc., a freight forwarding and customs clearing company used to import equipment for Shell's Bonga Project, a deepwater oil and gas project off the coast of Nigeria. In July 2007, approximately five months after Vetco Gray was convicted, the DOJ sent Shell a letter notifying it that the DOJ had become aware that Shell engaged Panalpina "to provide freight forwarding and other services . . . and that certain of those services may violate the [FCPA]." In its letter, the DOJ requested that Shell meet with it to discuss Shell's engagement of Panalpina. Shell complied with the request. At the meeting Shell agreed to conduct an internal investigation into its dealings with Panalpina and to report its findings to the DOJ, with the understanding that the report would be treated as confidential. The investigation was to be done pursuant to a plan approved by the DOJ, and Shell agreed to produce additional documents and information requested by the DOJ. The DOJ subsequently identified several individuals as potential witnesses and persons of interest regarding its investigation and requested Shell to produce

2

information related to them. One person identified was a Shell employee named Robert Writt. Writt's duties as to the Bonga Project included serving as the holder of the contract between Shell and Vetco Gray and being responsible for approving Vetco Gray's reimbursement requests.

Shell hired outside counsel and investigators to assist in the investigation. During the course of the investigation, Writt was interviewed several times about his knowledge of possible illegal payments made by Panalpina. In February 2009, Shell provided the investigators' findings and its report to the DOJ. Among other matters, the report set out that the impetus for it was the meeting between Shell and DOJ representatives regarding allegations of criminal violations. The report also contained information, analyses, and conclusions as to Shell's relationship with, and Writt's actions as they related to, Panalpina. The report stated that Writt was aware of "several red flags" concerning Panalpina's customs clearance process and that he provided inconsistent information about his knowledge of Panalpina's questionable acts. In addition to providing the report to the DOJ, Shell terminated Writt's employment. In its termination letter, Shell stated that Writt's conduct in connection with the Bonga Project was a "significant, substantial and unacceptable" violation of Shell's General Business Principles and Code of Conduct.

Writt sued Shell for defamation and wrongful termination. His defamation claim was based on allegations that in the report provided to the DOJ, Shell falsely accused him of approving bribery payments and participating in illegal conduct. Shell sought a traditional summary judgment as to the defamation claim on the grounds of absolute privilege.

While Shell's motion for summary judgment was pending, the DOJ filed an information charging Shell with conspiracy to violate the FCPA and aiding and abetting the making of false

3

books and records. Shell and the DOJ then executed a Deferred Prosecution Agreement—a type of agreement used by the DOJ when a corporation cooperates with an FCPA investigation. *See* Robert J. Sussman & Gregory S. Saikin, *Corporate Crimes: The Penalties and the Pendulum*, 43 THE ADVOC. (TEX.) 39, 41-42 (2008). In the Agreement, the DOJ acknowledged that Shell had (1) cooperated in the DOJ's investigation, (2) agreed to cooperate in any ongoing investigation, and (3) agreed to pay a monetary penalty. Shell's willingness to conduct an internal investigation, admit misconduct, and cooperate with the investigation was an important factor in the DOJ's decision to offer Shell the opportunity to enter into the Deferred Prosecution Agreement. The terms of the Agreement, which are more favorable than the criminal penalties that could have resulted from an FCPA prosecution, required Shell to continue to cooperate with the DOJ and other law enforcement agencies, pay a $30 million criminal fine, and implement an extensive FCPA compliance and reporting program. The Agreement provides that if Shell fully complies with its terms, then the criminal charges will be dropped. However, if Shell fails to abide by the Agreement's terms, the DOJ will resume the criminal prosecution.

The district court granted Shell's motion for summary judgment, concluding that Shell was absolutely privileged to provide the investigative report to the DOJ. Writt's wrongful termination claim proceeded to trial and the jury found against him. As a result, the trial court rendered a take-nothing judgment in favor of Shell. Writt appealed only from the summary judgment on his defamation claim.

The court of appeals reversed. *Writt v. Shell Oil Co.*, 409 S.W.3d 59, 76 (Tex. App.—Houston [1st Dist.] 2013). It held that the summary judgment evidence did not conclusively

establish that at the time Shell provided its report to the DOJ a criminal judicial proceeding against either Shell or Writt was ongoing, actually contemplated, or under serious consideration by either the DOJ or Shell. *Id.* at 76. Therefore, the report was only conditionally, not absolutely, privileged. *Id.* The court reasoned that Shell cooperated with the DOJ during an ongoing investigation and created the report as a part of its own voluntary internal investigation, but that those actions were not enough to conclusively establish that Shell provided the report under a serious threat of prosecution; nor was the fact the DOJ eventually initiated a criminal proceeding against Shell conclusive evidence that such a proceeding was actually contemplated or under serious consideration by the DOJ as of the time Shell provided the report. *Id.* at 72.

Shell contends that an absolute privilege extends to the report and the statements in it because it was furnished to the DOJ preliminarily to a proposed judicial proceeding.[1] It argues that the information contained in its report, including information about Writt, was solicited by the DOJ during an ongoing FCPA investigation; Shell compiled and provided the report under serious and good faith contemplation of a judicial proceeding; and those circumstances are sufficient for an absolute privilege to apply. In the alternative, Shell argues that its statements are absolutely privileged because they were made as part of a quasi-judicial proceeding.[2] Shell also argues that this Court's decision in *Hurlbut v. Gulf Atlantic Life Insurance Co.*, 749 S.W.2d 762, 768 (Tex. 1987),

---

[1] Six former United States Attorneys General, Michael B. Mukasey, Benjamin R. Civiletti, Edwin Meese, III, Richard L. Thornburgh, William P. Barr, and Alberto R. Gonzales, submitted an amicus curiae letter in support of Shell. The Chamber of Commerce of the United States of America, the National Association of Manufacturers, and the American Petroleum Institute submitted an amicus curiae brief in support of Shell.

[2] Because we determine that Shell's providing the report was made preliminarily to a proposed judicial proceeding, we do not address this contention.

5

is consistent with its position because the DOJ essentially told Shell that it was a target of a criminal investigation and solicited the report and information provided by Shell, whereas in *Hurlbut* the alleged defamatory statements were unsolicited statements and not instigated by a government investigation involving the party making the statement.

Writt does not assert that Shell's providing the report to the DOJ was not privileged; he simply urges that the court of appeals was correct in classifying Shell's communication as being conditionally privileged. He argues that Shell's report was provided during an ongoing investigation, but not as a communication preliminary to a judicial proceeding or as part of a quasi-judicial proceeding. He further maintains that the court of appeals' application of *Hurlbut* is consistent with the majority rule in other states as to communications made during a criminal investigation, and observes that the conditional privilege addresses any public policy concerns by protecting Shell from defamation liability so long as its statements were not false and malicious. Last, he urges that the summary judgment evidence was insufficient to establish that the DOJ's process had progressed from an investigation to a prosecution by the time Shell provided its report.

## II.  Standard of Review

We review the trial court's grant of summary judgment de novo. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). The evidence is viewed in the light most favorable to the nonmovant. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). In reviewing the record, we indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in favor of the nonmovant. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012).

6

The court of appeals noted that the parties did not agree on whether a plaintiff has the burden to negate absolute privilege as part of proving its cause of action for defamation, or whether absolute privilege is an affirmative defense where the elements must be proved by a defendant asserting it. *Writt*, 409 S.W.3d at 65-66. The court explained that in this case the burden of proof did not matter because Shell filed a traditional motion for summary judgement and was entitled to summary judgment only if the evidence conclusively proved that the absolute privilege applies. *Id.* Shell does not challenge the standard the court of appeals applied, and on this question we agree with the court of appeals: whether Shell was entitled to summary judgment in this case depends on whether its summary judgment evidence conclusively showed it was. The question of whether absolute privilege must be disproved as part of the plaintiff's cause of action once it is raised, or whether it is an affirmative defense, is not an issue we need address.

### III. Privileges and Judicial Proceedings

The proper administration of justice requires full and free disclosure of information as to criminal activity both by the public and by participants in judicial proceedings. *James v. Brown*, 637 S.W.2d 914, 916-17 (Tex. 1982) (per curiam). In support of this policy, Texas recognizes two classes of privileges applicable to defamation suits: absolute privilege and conditional or qualified privilege. *Hurlbut*, 749 S.W.2d at 768. In *Hurlbut* we relied heavily on the Restatement (Second) of Torts in differentiating between the two:

> An absolute privilege is more properly thought of as an immunity because it is based on the personal position or status of the actor. . . . Such immunity, however, attaches only to a limited and select number of situations which involve the administration of the functions of the branches of government, such as statements made during legislative and judicial proceedings . . . .

7

> Privileges of the second class, the conditional or qualified privilege, are true privileges because they arise out of the occasion upon which the false statement is published. . . . The occasions which may give rise to a conditional privilege are described in the Restatement.

*Hurlbut*, 749 S.W.2d at 768 (internal citations omitted). We quoted from the Restatement to explain that "[a] witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding." *Id.* at 767 (quoting RESTATEMENT (SECOND) OF TORTS § 588 (1977)); *James*, 637 S.W.2d at 917 (same); *see also* RESTATEMENT (SECOND) OF TORTS § 587 (1977) (noting that an absolute privilege applies to communications by potential parties in criminal prosecutions). The test for whether a communication is absolutely privileged when it occurs before judicial proceedings have begun entails both subjective and objective components. *See* RESTATEMENT (SECOND) OF TORTS § 588 cmt. e (1977) ("As to communications preliminary to a proposed judicial proceeding, the rule . . . applies only when the communication has some relation to a proceeding that is *actually contemplated* in good faith and under serious consideration by the witness or a possible party to the proceeding.") (emphasis added). The fact that a formal proceeding does not eventually occur will not cause a communication to lose its absolutely privileged status; however, it remains that the possibility of a proceeding must have been a serious consideration at the time the communication was made. *See id.* ("The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered."); *see also United States v. Baggot*, 463

8

U.S. 476, 484 (1983) ("The words '*preliminary to*' necessarily refer to judicial proceedings not yet in existence, where, for example, a claim is under study.").

In Texas, the absolute privilege is also extended to quasi-judicial proceedings and other limited instances in which the benefit of the communication to the general public outweighs the potential harm to an individual. *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994); *see also Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 913 (Tex. 1942) ("The rule is one of public policy. It is founded on the theory that the good it accomplishes in protecting the rights of the general public outweighs any wrong or injury which may result to a particular individual."). While abuse of the absolute privilege is possible, it is limited because the speaker will generally still be subject to the risk of criminal prosecution for perjury or obstruction of justice. *See, e.g.*, TEX. PENAL CODE ch. 37 ("Perjury and Other Falsification"); 18 U.S.C. § 1505 ("Obstruction of proceedings before departments, agencies, and committees").

Not all communications to public officials are absolutely privileged, but may yet warrant protection as being conditionally privileged:

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
>
> (a) there is information that affects a sufficiently important public interest, and
>
> (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

*Hurlbut*, 749 S.W.2d at 768 (quoting RESTATEMENT (SECOND) OF TORTS § 598 (1977)). This privilege is lost if abused, such as when the statement is made with malice and with knowledge of its falsity. *Id*.

## IV. Discussion

Shell argues that its report was absolutely privileged because it furnished the report in serious contemplation of a judicial proceeding, not on the bare possibility that such a proceeding might occur. *See id.* at 767-68; RESTATEMENT (SECOND) OF TORTS § 588 cmt. c, e (1977). It says the furnishing of the report must be viewed in the context of the DOJ's notifying Shell that it was a target of an investigation for FCPA violations as a follow-on to Vetco Gray's guilty plea, the fact that Shell's investigation and report were pursuant to that notification, and Shell's knowledge when it provided the report to the DOJ that the contents of the report were not favorable to it as regards the FCPA, including the statements about Writt. Shell maintains that those facts are conclusively established by the record and thus the context of its reporting to the DOJ distinguishes this case from *Hurlbut*, in which the defamatory communications to a prosecuting authority were not by the target of an investigation. Shell further argues that the court of appeals incorrectly determined Shell's statements were not absolutely privileged because the court found that the evidence did not establish that the DOJ filed, proposed to file, or had gathered enough information to file criminal charges against Shell at the time Shell provided its report. Shell contends that no Texas court, including this Court in *Hurlbut*, has held that sufficient information to file criminal charges must have been accumulated by the government before a communication will be absolutely privileged. It asserts that

10

the only court to mention such a standard did so in dictum. *See San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 99 (Tex. App.—San Antonio 2003, pet. denied).

In support of its assertions, Shell first says there is no dispute about its status being that of a party to an investigation into criminal activity with the possibility of an ensuing criminal proceeding: it knew Vetco Gray had pled guilty to using Panalpina's services, the DOJ had the information from that prosecution before it contacted Shell, and no reasonable conclusion can be drawn from the DOJ's July 2007 letter other than that Shell was a target of an FCPA investigation. Next, Shell says the evidence is conclusive that its cooperation in the investigation and its report to the DOJ resulted from the DOJ's solicitation and "invitation" to discuss its activities in light of the FCPA. Shell asserts that the evidence shows there is no doubt about its seriously contemplating the possibility of an FCPA criminal proceeding when it furnished the report to the DOJ, given the fact that it was a target of the DOJ's investigation and the undisputed facts that its self investigation (1) took over eighteen months, (2) involved both outside and inside counsel as well as forensic consultants, (3) cost over $10 million, and (4) recommended disciplinary actions for staff members as a result of Shell's dealings with Vetco Gray and Panalpina. Shell says that in Writt's response to its motion for summary judgment he agrees that Shell provided its report to the DOJ during an ongoing FCPA investigation, which demonstrates that Shell was seriously contemplating the possibility of a criminal proceeding. Writt's response said that Shell's report described him as a participant in illegal conduct, and stated that he had approved payments knowing that the payments were facilitating bribes. Shell, while not in agreement with all that Writt says, notes that no reasonable doubt exists that all of those actions would be attributable to Shell in an FCPA

11

prosecution—and Shell and its lawyers knew it. Third, Shell argues that the dramatic increase in FCPA prosecutions and penalties assessed against corporations in the past decade, the DOJ's invitation to discuss Panalpina's "possibly illegal" activities in light of the previous successful prosecution of Vetco Gray for its activities including those related to Panalpina, and the facts Shell discovered during its internal investigation are conclusive of the fact that its contemplation of a possible criminal prosecution was reasonable as of the time it provided the report to the DOJ.

We agree with Shell. To begin with, the principles we espoused in *Hurlbut* control here, but the communications and circumstances in *Hurlbut* differ from those surrounding Shell's providing its report to the DOJ.

In *Hurlbut*, C. Daniel Hurlbut and A.C. Hovater (sometimes collectively referred to as Hurlbut), were licensed insurance agents who formed an insurance agency to market a group insurance policy for which Gulf Atlantic Insurance Company was to obtain regulatory approval and then underwrite. *Hurlbut*, 749 S.W.2d at 763. Gulf never obtained approval for the policy, although its representatives encouraged Hurlbut to proceed with selling it. *Id.* at 763-64. Because state approval of the policy was never obtained by Gulf, Hurlbut was never furnished a master exemplar policy to present to prospective clients. *Id.* Wayne Holder, city attorney for one of Hurlbut's prospective municipal clients, questioned Hurlbut's inability to produce an exemplar policy. *Gulf Atlantic Life Ins. Co. v. Hurlbut*, 696 S.W.2d 83, 89-90 (Tex. App.—Dallas 1985), *rev'd*, 749 S.W.2d 762 (Tex. 1987) [hereinafter the court of appeal's decision is referred to as *Gulf Atlantic*]. Hurlbut referred Holder to Gulf for confirmation of the existence of the policy and for assurance that Gulf was underwriting it. *Id.* at 89. Holder called William Barnes, the president of Gulf, who told

12

Holder that Gulf was not underwriting such a policy. *Id.* That prompted Holder to contact the Texas Attorney General who assigned Assistant Attorney General Bill Flanary to investigate Hurlbut and the agency. *Id.* at 89-90. Flanary met with Barnes, who said that Gulf was not involved with Hurlbut or the policy. *Id.* at 90. After the meeting with Barnes, and upon further investigation, Flanary became convinced that Hurlbut was selling insurance illegally. *Id.* A meeting was arranged between Hurlbut and representatives of Gulf, including Barnes, ostensibly to resolve questions about the group policy program. *Hurlbut*, 749 S.W.2d at 764. Unknown to Hurlbut and Hovater, Flanary was also invited to the meeting. *Id.*

At the meeting, Barnes repeated what he had earlier said to Flanary about Hurlbut not being authorized by Gulf to market the group policy and that Gulf was not involved with the policy. *Id.* Flanary asked Hurlbut and Hovater to accompany him to the Dallas Attorney General's office where they gave statements and provided information about their activities related to the group policy. *Id.* At one point Flanary became suspicious about Gulf's position and voiced his thoughts to Barnes that the investigation might be targeting the wrong persons—that Gulf might be the more proper target. *See Gulf Atlantic*, 696 S.W.2d at 106 (Akin, J., dissenting). Once Flanary voiced that concern, Barnes and Gulf representatives stopped communicating with authorities about the matter. *Id.*

After that, life did not go well for Hurlbut and Hovater. Their assets were seized and liquidated, they were indicted, and their insurance agent licenses were revoked. *Hurlbut*, 749 S.W.2d at 764. Eventually they sued Gulf, its corporate parent, and several corporate officers on various theories including business disparagement. *Id.* The jury found for Hurlbut and Hovater and the trial court rendered judgment for them. *Id.* at 763. The court of appeals reversed. *Gulf Atlantic*,

13

696 S.W.2d at 83. As relevant to the matter now before us, the court of appeals concluded that false statements made by Gulf's president to the assistant attorney general during the meeting where Hurlbut was present were absolutely privileged because the evidence conclusively established that the statements were made to a public official or were made in the course of a judicial or quasi-judicial proceeding. *Id.* at 100.

In reviewing the privilege issue we looked to the Restatement (Second) of Torts dealing with privileges. *Hurlbut*, 749 S.W.2d at 767-68. We particularly referenced Section 588, addressing the absolute privilege related to testimony of a witness in a judicial proceeding, and Section 598, addressing the conditional privilege available to persons communicating information of public interest to a public officer or private citizen authorized to take action if the information is true. *Id.* We concluded that the communications made by Gulf's president to the assistant attorney general were more like statements described in Section 598 than those addressed by Section 588, and thus were conditionally, not absolutely, privileged. *Id.*

After we decided *Hurlbut*, several courts have considered how Texas law applies with regard to the absolute privilege. *See, e.g.*, *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 994 (5th Cir. 1999) (concluding that Texas courts have yet to extend the absolute privilege to unsolicited communications made preliminary to a judicial proceeding). For instance, the federal district court in *Clemens v. McNamee* concluded that statements by Brian McNamee, a witness in an investigation into the distribution of illegal substances and money laundering, were absolutely privileged. *Clemens v. McNamee*, 608 F. Supp. 2d 811, 824-25 (S.D. Tex. 2009). During the course of the investigation, McNamee was told by the Assistant United States Attorney, FBI agents, and IRS

14

agents conducting the investigation that his status as a witness would be reconsidered if he failed to cooperate with the investigation, which included being interviewed by the Mitchell Commission. *Id.* at 824. All of McNamee's interviews with the Mitchell Commission were arranged and attended by Assistant United States Attorneys or other government agents. *Id.* Although McNamee cooperated with the investigation and offered information voluntarily, he was for all practical purposes compelled to make his statements to the commission. *Id.* at 825. The court concluded that to classify McNamee's statements as only conditionally privileged would have caused great harm to the administration of government and the government's ability to ensure justice was served. *Id.* at 825-26.

In this case, the facts and circumstances surrounding Shell's communications are more analogous to those in *Clemens* than those in *Hurlbut*. The summary judgment evidence establishes that at all relevant times, Shell was a target of the DOJ's investigation, while Gulf was not a target of the investigation when its president made the allegedly defamatory statements that Gulf had not authorized Hurlbut to sell the group policies in question and that Gulf was not underwriting the policies. The difference between Shell's status and that of Gulf are brought into clearer focus by the fact that after Gulf's president was told by the assistant attorney general investigating the case that the investigation might need to include Gulf as well as Hurlbut, Gulf's communications to the prosecuting authorities stopped. *See Gulf Atlantic*, 696 S.W.2d at 106 (Akin, J., dissenting). Further, when the DOJ's leverage over Shell vis-à-vis the FCPA and its somewhat draconian potential penalties are considered, it is manifest that Shell was, practically speaking, compelled to

15

undertake its internal investigation and report its findings to the DOJ, just as McNamee was, practically speaking, compelled to cooperate. *See Clemens*, 608 F. Supp. 2d at 825.

Over the course of the last decade, FCPA enforcement actions have increased dramatically. *Compare FCPA and Related Enforcement Actions*, U.S. DEP'T OF JUSTICE, http://www.justice.gov/criminal/fraud/fcpa/cases/2014.html (last visited May 1, 2015), *with FCPA and Related Enforcement Actions*, U.S. DEP'T OF JUSTICE, http://www.justice.gov/criminal/fraud/fcpa/cases/2004.html (last visited May 1, 2015). *See 2013 Year-End FCPA Update*, GIBSON, DUNN & CRUTCHER LLP, 1-5 (Jan. 6, 2014), http://www.gibsondunn.com/publications/Documents/2013-Year-End-FCPA-Update.pdf. The DOJ made enforcement of the FCPA a priority in the post-Enron and Sarbanes-Oxley era, beginning in 2003. Michael B. Bixby, *The Lion Awakens: The Foreign Corrupt Practices Act–1997 to 2010*, 12 SAN DIEGO INT'L L.J. 89, 104 (2010). In 2007, the year the DOJ informed Shell of its investigation, FCPA enforcement actions more than doubled from the previous year. *Id.* By 2010, the year Shell and the DOJ entered into their Deferred Prosecution Agreement, FCPA enforcement had again more than doubled from 2007. *Id.* at 105. The largest FCPA resolution, including fines, penalties, disgorgement, and interest, occurred in 2008, topping $800 million, and the average fines from 2009 to 2010 increased from over $58 million to more than $81 million. *Id.* at 106. From the time Shell was first contacted by the DOJ to the time it provided its report to the DOJ, FCPA compliance was of great concern for U.S. businesses operating overseas and potential violations were not taken lightly. Moreover, businesses that chose not to cooperate were subjected to substantially greater punishments if a DOJ prosecution was successful. *See* Joel Androphy & Ashley Gargour, *The*

*Intersection of the Dodd-Frank Act and the Foreign Corrupt Practices Act: What All Practitioners,*

*Whistleblowers, Defendants, and Corporations Need to Know*, 45 TEX. J. BUS. L. 129, 138 (2013)

("Knowing all the consequences that accompany FCPA litigation, many companies choose to be

proactive and self-report to the DOJ and SEC to take advantage of any leniency that the government

might offer."). Federal prosecutors and the U.S. Sentencing Guidelines "place a high premium on

self-reporting, along with cooperation and remedial efforts, in determining the appropriate resolution

of FCPA matter." U.S. DEP'T OF JUSTICE & U.S. SECURITIES AND EXCHANGE COMM'N, A

RESOURCE GUIDE TO THE U.S. FOREIGN CORRUPT PRACTICES ACT, 54 (2012), *available at*

http://www.justice.gov/criminal/fraud/fcpa/guidance/guide.pdf. "Specifically, prosecutors consider

whether the company made a voluntary and timely disclosure as well as the company's willingness

to provide relevant information and evidence and identify relevant actors inside and outside the

company, including senior executives." *Id.*

In sum, the summary judgment evidence is conclusive that when Shell provided its internal

investigation report to the DOJ, Shell was a target of the DOJ's investigation and the information

in the report related to the DOJ's inquiry. The evidence is also conclusive that when it provided the

report, Shell acted with serious contemplation of the possibility that it might be prosecuted.

Despite Writt's admonition that a decision in favor of Shell would mandate overruling

*Hurlbut*, the case before us and *Hurlbut* are different; we need not and do not overrule it.

### V. Conclusion

Shell's providing its report to the DOJ was an absolutely privileged communication. We

reverse the judgment of the court of appeals and reinstate that of the trial court.

17

_____
Phil Johnson
Justice


**OPINION DELIVERED:** May 15, 2015