In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-20-00174-CV

SAMSON EXPLORATION, LLC, Appellant

V.

JOE A. BORDAGES JR., ET AL, Appellees

On Appeal from the 60th District Court
Jefferson County, Texas
Trial Cause No. B-173,008-A

## OPINION

Samson Exploration, LLC f/k/a Samson Lone Star, L.P. ("Samson")[1] raises

two issues with various sub-issues in this appeal of the trial court's Final Judgment,

---

[1] The trial court rendered judgment against Samson Exploration, LLC. However, when they filed their original petition, the plaintiffs sued Samson Lone Star, Limited Partnership. We cannot locate a written stipulation in the record indicating that Samson Exploration, LLC acquired all of Samson Lone Star's assets and liabilities, and the summary judgment motions do not address whether Samson Exploration, LLC is Samson Lone Star's successor. Nonetheless, the parties all treat Samson Exploration LLC as Samson Lone Star's successor, and none of the parties

1

which incorporated several partial summary judgment orders in favor of the Bordages and which denied Samson's cross-motion for summary judgment. Samson argues: (1) that the trial court erred in granting summary judgment against Samson and in failing to grant Samson's cross-motion for summary judgment and its motion for reconsideration; and (2) the trial court miscalculated late charges through its misconstruction of the late charge provisions of the leases. In support of its second issue, Samson asserts (a) the trial court improperly compounded the late charges, because it included "late charges on late charges," (b) the Bordages cannot use collateral estoppel offensively to preclude Samson's arguments that the late charges were improperly compounded, (c) Samson does not owe any late charges on the royalties paid in 2007 because Samson paid them when they were "due" under the lease, and (d) Samson does not owe additional attorneys' fees. For the following reasons, we affirm the trial court's judgment.

argue that Samson Exploration, LLC was not properly named or that it was not liable in the capacity it was sued. For the purposes of this opinion, we assume Samson Exploration, LLC is Samson Lone Star's successor, and we refer to the entity as "Samson." We expressly do not decide if Samson Exploration, LLC is Samson Lone Star's successor, as that issue has not been brought before the Court and is not at issue in the appeal.

# I. Background[2]

## A. Leases

In 1999, the Bordages[3] executed an oil and gas lease as Lessors and named Samson as the Lessee, which covered 95 acres in Hardin County, Texas. No well was drilled on this tract, but it was included in two units, the Joyce DuJay No. 1 Gas Unit and the Joyce DuJay "A" No. 1 Gas Unit. The Bordages and Hooks Landowners have separate but identical oil and gas leases with Samson, collectively called the "Tract 4/14 Leases," as they cover different tracts of land Samson numbered 4 and 14.

## B. Purported Title Dispute

In 2001, Samson asked an outside lawyer to prepare a title opinion covering the 95 acres at issue. In December 2001, the lawyer issued the title opinion noting that sometime between 1938 and 1943, Charles G. Hooks and other owners conveyed an undivided 1/3 interest in the property to J.A. Bordages, but it appeared the deed was never recorded in Hardin County, Texas. The title opinion also noted there was a question regarding whether a trust for the benefit of Autrey Bordages, wife of J.A. Bordages, still existed. In order to cure these issues, the attorney

---

[2] We limit the background discussion to those matters necessary to the determination of this appeal.

[3] The individuals executing the leases included Joe A. Bordages, Katherine Bordages Brownlee, Stephanie Bordages Knobel, Joseph A. Bordages III, Joanna M. Pastore, Scott Alan Bordages, and Allison Bordages Koskella.

3

requested (1) the missing deed and (2) confirmation that the trust terminated with written documentation of how the trust's assets were distributed. On May 14, 2002, Samson sent correspondence to the Bordages requesting the documentation necessary for the title opinion.

By letter dated May 18, 2002, Joe Bordages responded and advised that the trust terminated, and after Autrey's death, her assets were distributed in accordance with her will. In early June 2002, Samson acknowledged it had spoken with Richard Pastore, an attorney and husband of late Landowner JoAnna Pastore, who advised Samson that there never was a deed between the parties, but there was a Certificate of Interest. Samson conveyed this information via email to the attorney who prepared the title opinion. The attorney advised Samson that the "Certificate of Interest vests J.A. Bordages with beneficial or equitable title to the 1/3 interest, but not legal title." The attorney further advised that Samson "may want to secure an affidavit from Chas. G. Hooks & Sons with the aforesaid Certificate of Interest attached and file it of record in Hardin Co." but noted "this won't cure the defect [but] will help explain the circumstances and put [third] parties on notice of the claim of the heirs of J.A. Bordages to this 1/3 interest." On September 18, 2002, Samson re-sent its May 14 letter and stamped it "second request."

Of note, no other parties or interest owners contested the Bordages' royalty interests in the subject property or claimed any right to it. Despite this and having

4

the Certificate of Interest regarding the above-described conveyance, Samson refused to pay the Bordages royalties on the Joyce DuJay Units until 2007. In October 2007, the Hooks provided an affidavit confirming the transfer and again attached the Certificate of Interest. In December 2007, Samson began paying the Bordages royalties on the Joyce DuJay Units. The summary judgment evidence included excerpts of Samson corporate representative John Snively's testimony that the royalty amounts accrued beginning with first production, but Samson did not pay any late charges or interest on those royalties.

## II. Procedural History

### A. Litigation – Claims

The underlying litigation involves a protracted dispute over oil and gas leases covering properties in Hardin and Jefferson Counties. Several families who held royalty interests sued Samson for breach of the lease agreements. As noted, the Bordages Plaintiffs and Hooks Plaintiffs had identical leases, referred to as the "Tract 4/14 Leases."

In 2005, most of the Bordages Landowners joined the *Klorer v. Samson* litigation with the filing of the First Amended Petition, while the remaining Bordages Landowners joined the litigation in 2006. The Bordages and other plaintiffs asserted claims for various breaches of the lease agreements including failure to pay royalties, violations of the Texas Natural Resources Code, and

5

negligence, among others.[4] Later amendments to the petitions included allegations of breaches specific to the Tract 4/14 Leases and its Most Favored Nations clause, as well as a claim for unpaid late charges.[5]

## B. Severance

Over the Plaintiffs' objection, Samson moved to sever the Tract 4/14 Lease claims, which the trial court granted. Following the severance, there were three groups of Plaintiffs: (1) the Klorer/T.S. Reed Properties Plaintiffs; (2) the Hooks Plaintiffs; and (3) the Bordages Plaintiffs. The Klorer and Hooks lawsuits had final judgments entered and appealed those to their conclusion. Because the Hooks' claims included fraud, those claims were tried separately and finalized after a lengthy appeals process. *See Samson Lone Star, Ltd. P'ship v. Hooks*, 389 S.W.3d 409 (Tex. App.—Houston [1st Dist.] 2012), *aff'd in part, rev'd in part Hooks v. Samson Lone Star Ltd. P'ship*, 457 S.W.3d 52 (Tex. 2015), *on remand Samson Lone Star, Ltd. P'ship v. Hooks*, 497 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *see also Samson Exploration, LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 26 (Tex. App.—Beaumont 2015), *aff'd* 521 S.W.3d 766 (Tex. 2017).

---

[4] We enumerate only the causes of action pertinent to this appeal.

[5] The Most Favored Nations provision required that, under certain circumstances, the royalties payable to the Bordages be elevated to match the highest royalty payable to Samson's other lessors.

## C. Live Pleading

When the trial court signed the final judgment, the Bordages Plaintiffs' Eleventh Amended Petition was the live pleading. The claims alleged included breach of contract for Samson's failure to properly pay royalties, failure to pay late charges under the Tract 4/14 leases, and failure to pay in accordance with the Most Favored Nations Clause, among others.

## D. Summary Judgments

The Bordages filed several motions for partial summary judgment addressing their various claims and several amended motions for partial summary judgment. The trial court granted the Bordages' amended motions addressing unpooling, accrued unpaid royalties, and Tract 4/14 Leases.[6] For the units at issue, the parties also stipulated to the maximum amount of royalty percentage attributed to each plaintiff since the date of first production. The Bordages ultimately filed their "Amended Motion for Partial Summary Judgment of Damages and Entry of Final Judgment," and Samson filed an "Amended Motion for Reconsideration, Cross-Motion for Partial Summary Judgment on Late Charges and on Accrued Royalties, and Motion for Partial Summary Judgment on Res Judicata and Collateral Estoppel." In that motion, Samson asked the trial court to reconsider the partial summary

---

[6] Although not at issue in this appeal, the trial court also granted Samson's motion for partial summary judgment on its offset obligations and denied Samson's other partial summary judgment motions.

7

judgments previously granted in favor of the Bordages and it also sought to have the trial court preclude the Bordages from using collateral estoppel offensively, by a cross-motion for summary judgment. The trial court denied both of Samson's motions. The trial court granted the Bordages' Amended Motion for Partial Summary Judgment of Damages and Entry of Final Judgment. In addition to granting the Bordages' Amended Motion for Partial Summary Judgment of Damages, the trial court's Final Judgment incorporated the following partial summary judgment orders: (1) *Order Granting Plaintiffs' First Amended Motion for Partial Summary Judgment (Accrued Unpaid Royalties),* recommended by Special Master W. Frank Newton on July 29, 2008, and adopted by this Court on July 30, 2008 (the "Accrued Unpaid Royalties Order"); (2) *Order on Plaintiffs' First Amended Motion for Partial Summary Judgment (Tract 4/14 Leases),* recommended by Special Master W. Frank Newton on July 29, 2008, and adopted by the Court on July 30, 2008 (the "Most Favored Nations Order"); and (3) *Order Granting Plaintiffs' Motion for Partial Summary Judgment: Liability for Ad Valorem Taxes (Tract 4/14 Leases),* recommended by Special Master W. Frank Newton on August 9, 2012, and adopted by the Court on August 10, 2012 (the "Ad Valorem Taxes Order"). The final judgment in favor of the Bordages awarded total damages of $12,955,919, which included $8,312,203 for accrued and unpaid royalties and $4,643,716 for Most Favored Nations damages. The trial court also awarded

8

$97,421.25 in attorney's fees through judgment and appellate attorney's fees of $135,000.

### III. Summary Judgment Standard of Review

We review a trial court's decision to grant summary judgment de novo. *See Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex. 2015) (citation omitted). We view the evidence in the light most favorable to the nonmovant. *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005)). In doing so, we indulge every reasonable inference and resolve any doubts against the motion. *See City of Keller*, 168 S.W.3d at 824. "Undisputed evidence may be conclusive of the absence of a material fact issue, but only if reasonable people could not differ in their conclusions as to that evidence." *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012) (citation omitted).

A party moving for traditional summary judgment has the burden of establishing there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017) (citations omitted). Construing an unambiguous oil and gas lease presents a question of law for the court. *Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 554 (Tex. 2002). Accordingly, we review questions involving the interpretation of a lease de novo. *See id*. When both sides move for summary judgment, and the trial court

9

grants one motion and denies the other, we review all summary judgment evidence before the trial court to determine the questions presented by the parties in their competing motions. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex. 2009). In appeals of a ruling on cross-motions for summary judgment, we are required to render the judgment the trial court should have rendered. *See id.*

## IV. Analysis

## A. Law: General Principles of Contract Interpretation

We employ a de novo standard when reviewing lease-construction questions. *See Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 147 (Tex. 2020) (citation omitted). "'An oil and gas lease is a contract, and its terms are interpreted as such.'" *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 210 (Tex. 2011); *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). When we construe an oil and gas lease, we seek to enforce the parties' intention as they expressed it in the lease. *See Tittizer*, 171 S.W.3d at 860; *see also Emerald Oil*, 348 S.W.3d at 211. "The most important consideration in interpreting a lease is the agreement's plain, grammatical language." *See Endeavor Energy Res.*, 615 S.W.3d at 148 (citing *Anadarko*, 94 S.W.3d at 554). We attempt "to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean." *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d

10

755, 764 (Tex. 2018). We examine the entire lease, attempting to harmonize all parts, even if varying parts seem contradictory. *See Anadarko*, 94 S.W.3d at 554; *see also Endeavor Energy Res.*, 615 S.W.3d at 148. "[W]e avoid construing contracts in a way that renders contract language meaningless." *Sundown Energy LP v. HJSA No. 3, Limited P'ship*, 622 S.W.3d 884, 888 (Tex. 2021) (citing *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 747 (Tex. 2020)). We start with the paramount consideration in interpreting any contract: "the plain meaning of the [agreement's] operative language." *See Endeavor Energy Res.*, 615 S.W.3d at 149 (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015)).

**B. Lease Language: Compounded Late Charges**

Samson contends that collateral estoppel does not preclude them from challenging the compounding of late charges. For purposes of our analysis, we will assume without deciding that collateral estoppel does not bar Samson from challenging the compounding of late charges. We address Samson's argument that the lease's language does not permit the compounding of late charges and that the late charges, if any, should be calculated on a simple basis.[7]

Samson correctly notes that the Final Judgment's damages calculation was based on and incorporated the prior "Late Charges" partial summary judgment order.

---

[7] During oral argument, Samson agreed that the late charges constituted a form of interest.

11

That order required Samson to pay late charges "computed for each month of past due royalties, based on the amount due each month, including any previously accrued Late Charges, calculated at eighteen percent (18%) per annum." Samson complains that the trial court's order rewrites the parties' lease, which provides:

> C. All past due royalties (including any compensatory royalties payable under Paragraph VI.B.) shall be subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law commencing on the day after the last day on which such monthly royalty payment could have been timely made and for every calendar month and/or fraction thereof from the due date until paid, plus attorney's fees, court costs, and other costs in connection with the collection of the unpaid amounts. Any Late Charge that may become applicable shall be due and payable on the last day of each month when this provision becomes applicable.

Samson's argument has two components. First, it asserts that the lease only authorizes a late charge on past due royalties and does not authorize a late charge on past due late charges, and to require "late charges on late charges," the trial court had to add language to the lease. Second, Samson asserts that according to the lease, the late charges are subject to a simple, rather than compound calculation.

We begin with the plain meaning of the lease's operative language. *See id.* The language provides that "[a]ll past due royalties" are

> subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law commencing on the day after the last day on which such monthly royalty payment could have been timely made . . . plus . . . other costs in connection with the unpaid amounts.

12

While past due royalties are explicitly noted as being subject to a late charge and will commence "on the day after the last day on which such monthly royalty payment could have been timely made[,]" the provision further specifies that the late charge will be based on the amount due. To determine what "amount due" encompasses, we must also look to the provision's final sentence, which states, "Any Late Charge that may become applicable shall be due and payable on the last day of each month when this provision becomes applicable." This sentence specifies a time certain when the late charge becomes "due and payable." To adopt Samson's interpretation would ignore this last sentence, rendering it meaningless. *See Sundown Energy*, 622 S.W.3d at 888.

The parties chose to include language specifying: (1) when the late charge commences (i.e., "on the day after the last day on which such *monthly* royalty payment could be made"); and (2) when it becomes due and payable (i.e., "each month"), which necessarily means late charges are encompassed in the "amount due" on which the late charge is based. (Emphasis added.) The parties agreed that the late charges would commence monthly on the day after the last day the royalties could be timely paid, and those late charges became due and payable on the last day of each month. When this provision is read in conjunction with the provision specifying the time for royalty payments, the plain language of the lease provision states the late charges commence at the beginning of each month, whereas they

13

become "due and payable" at the end of each month. Accordingly, we hold the parties' intent as manifested by the plain meaning of the lease's operative language authorized "late charges on late charges" and did not limit a late charge to past due royalties. *See Endeavor Energy Res.*, 615 S.W.3d at 149.

Having determined that the lease authorized "late charges on late charges," we now turn to whether such charges should have been calculated on a simple rather than compound basis. Samson asserts that "had the parties wanted the late charges to compound on a monthly basis, they could have said so[]" and "if interest is to be compounded, it must be expressly so stated." Samson advocates that if the parties had intended the compounding, they could have used the word "compounded." While we agree the parties did not use the word "compounded," we disagree that their failure to do so necessarily means the operative language the parties employed precludes compounding late charges.

In rejecting arguments that "unpaid balance" meant only the principal balance and that the contract did not permit compounding of interest, the Fourteenth Court of Appeals explained that "the word 'monthly' was used to establish the periodic 'rest' upon which compound interest could be calculated." *Texon Energy Corp. v. Dow Chemical Co.*, 733 S.W.2d 328, 331 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). The lease before us noted that late charges would become "due and payable on the last day of *each month*[.]" (Emphasis added.) A commonly accepted

14

definition of "each" is "every thing, person, etc. in a group of two or more, considered separately[.]" *Each*, CAMBRIDGE.ORG, https://dictionary.cambridge.org/dictionary/english/each (last visited Dec. 10, 2021). The operative language means every month. By utilizing the phrase "each month," the contract provided that the late charges became due every month (i.e., monthly) Thus, the late charges became part of the "amount due." This provided a periodic rest such that the next month's late charge could be calculated. *See Texon Energy Corp.*, 733 S.W.2d at 331.

The contract's language authorized compounding the late charges, rather than a simple interest calculation. Contrary to Samson's assertion, this authorization needed no additional language, as the "the plain meaning of the [agreement's] operative language[]" reveals. *See Endeavor Energy Res.*, 615 S.W.3d at 149. To hold otherwise would require us to disregard the timeframe for when late charges became due and payable, that it occurred each month, and that late charges were necessarily included in the amount due. Such an interpretation would render the last sentence of this provision meaningless, which we avoid. *See Sundown Energy*, 622 S.W.3d at 888.

We overrule these issues.

## C. Lease Language: When Royalties Are Due and Title Dispute

Samson argues that the royalties were not "due," because the Bordages failed to provide "reasonable assurances that they were the proper parties to receive the royalties until October 2007." Samson contends its December 2007 payments were thus timely, and it did not owe late charges. Samson further argues that it did not know who to pay, so the royalties were not due. Relevant to this analysis is the following lease language:

> ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, and in lieu of the terms and provisions contained in Sections 91.401 through 91.406 of the Texas Natural Resources Code, the parties hereto specifically agree that the following provisions shall apply to this Lease and all royalty payments made hereunder or other rights as provided in the above listed sections, and that such provisions of the Texas Natural Resources Code shall not be applicable; such parties further, by their signatures below, waive any and all rights which might be claimed or asserted under such Sections 91.401 and 91.406 of the Texas Natural Resources Code; thus it is specifically provided that:
>
> . . .
>
> B. Royalties on production shall be paid on a calendar month basis. The royalty for the calendar month in which production is first marketed shall be paid on or before the first day of the calendar month next following the expiration of sixty (60) days from the execution date of the completion report or potential test for the well that is filed with the Railroad Commission of Texas, and the respective royalty payments for each subsequent calendar month of production shall be made [o]n or before the first day of each successive calendar month following the calendar month in which the first payment is due.

16

### 1. When Payments are "Due" Under the Lease

Where, as here, the lease is plain and unambiguous, we enforce the parties' intent as expressed in the lease. *See Tittizer*, 171 S.W.3d at 860. The lease expressly provides that the royalties for the first production marketed "shall be paid on or before the first day of the calendar month next following the expiration of sixty (60) days from the execution date of the completion report or potential test for the well that is filed with the Railroad Commission[.]" The lease instructs that the commencement deadline for royalty payments was triggered by Samson's Railroad Commission filings. The summary judgment record establishes that on February 7, 2002, Samson filed its completion report with the Railroad Commission for the Joyce DuJay No.1, and on October 24, 2002, it filed its completion report for the Joyce DuJay A-1.

The provision says nothing about to whom payment is to be made. Samson contends that the lease did not provide a definition for the word "due," so it should be given its generally accepted meaning. A commonly accepted definition of "due" is "[i]mmediately enforceable," or "[o]wing or payable." *Due*, Black's Law Dictionary (9th ed. 2009). Here, the lease provision at issue describes *when* the payment is required, and directly links the first royalty payment to the filing of a completion report or a test well report with the Railroad Commission rather than *who* is to be paid.

**2. Do the Leases Excuse Paying Late Charges for a Title Dispute?**

The plain language of the lease does not excuse non-payment of late charges in the event of a title dispute. No language in the lease supports Samson's interpretation of excusing nonpayment of late charges in the event of an "ownership issue[.]" Texas Natural Resources Code section 91.402(b) authorizes withholding of payments without interest. *See* Tex. Nat. Res. Code Ann. § 91.402(b). However, the parties' agreement expressly states that the lease's provisions outlining when "royalty payments made hereunder" apply "in lieu of" Texas Natural Resource Code Provisions 91.401 through 91.406, making this "safe harbor" provision inapplicable. The parties were free to contract around these provisions. *See ConocoPhillips v. Koopmann*, 547 S.W.3d 858, 862, 878–79 (Tex. 2018) (explaining the parties were free to contract around Texas Natural Resources Code provisions); *T.S. Reed Props.*, 521 S.W.3d at 53 (concluding the lease did not excuse interest payments due to a title dispute, and Natural Resources Code Section 91.402(b) did not "restrict the freedom of the parties to a lease to contract for interest payments on suspended royalties"). The parties explicitly contracted around Texas Natural Resources Code sections 91.401-.406 and chose to use the lease language in lieu of the statutory provisions to govern time for payment of royalties and late charges. The parties disavowed the applicability of these statutory provisions, including the "safe harbor" provision permitting the withholding of payments without interest. The lease

18

language controls, and nothing in the lease excused late charges on past due royalties for a title dispute. Samson's argument lacks merit.

### 3. No Bona Fide Title Dispute

Even if the lease provided an excuse for non-payment of late charges, which it does not, the summary judgment evidence does not show a bona fide dispute existed regarding the Bordages' title to the minerals in the tract they leased to Samson.[8] *See T.S. Reed Props.*, 521 S.W.3d at 53 (noting lack of summary judgment evidence showing existence of a bona fide title dispute). There was no evidence that the minerals had not been conveyed to the Bordages. Despite Samson disavowing knowledge of who to pay, Samson advised the taxing authorities that the Bordages owned these interests and the Bordages received corresponding tax statements. In its briefing, Samson states that in 2007, it was willing "to recognize that the six Plaintiffs held equitable title based on the Hooks' affidavit." However, five years earlier Samson knew the Bordages had equitable title. In 2002, the attorney who issued the title opinion advised Samson that the Bordages held equitable title based

---

[8] Even when section 91.402(b) applies, courts have explained that for an operator to be excused from paying interest under section 91.402(b), there must be "a *legitimate* title dispute." *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 554 (Tex. App.—Austin 1999, pet. denied) (citing *Concord Oil Co. v. Pennzoil Expl. & Prod. Co.*, 966 S.W.2d 451, 461 (Tex.1998)). In *Stable Energy, L.P. v. Newberry*, the Austin Court of Appeals concluded there was not a legitimate title dispute and reasoned that "[n]o one asserted a claim to the [ ] appellees' interests or contended that their interests were invalid." *Id.*

on the very same Certificate of Interest that Samson was willing to rely upon in 2007 that accompanied the affidavit. The summary judgment record shows no legitimate title dispute existed, because no other interest owner questioned or claimed a right to the Bordages' royalty interests in the subject property. *See Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 554 (Tex. App.—Austin 1999, pet. denied) (citing *Concord Oil Co. v. Pennzoil Expl. & Prod. Co.*, 966 S.W.2d 451, 461 (Tex.1998)) (concluding no legitimate title dispute existed and reasoning that "[n]o one asserted a claim to the [ ] appellees' interests or contended that their interests were invalid[]"); *see also See T.S. Reed Props.*, 521 S.W.3d at 53. Rather, the evidence conclusively established the contrary.

We overrule these issues.

### V. Conclusion

We conclude the lease's payment provision permitted the compounding of late charges. The lease did not provide an exception to the payment of late charges on past due royalties, and no bona fide title dispute existed that would alter when royalties were due under the lease. Accordingly, we overrule all of Appellant's issues and affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

20

Submitted on September 16, 2021
Opinion Delivered January 13, 2022

Before Golemon, C.J., Kreger and Horton, JJ.