

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

No. 08-24-00220-CV

---

Vanessa Velez Labrado, Appellant

v.

Leith Labrado and Laboe Labrado, Appellees

---

On Appeal from the 243rd District Court
El Paso County, Texas
Trial Court No. 2021DCV3955

---

## MEMORANDUM OPINION

In the underlying lawsuit, Leith Labrado, Laboe Labrado, and Three R's School, LLC (Three R's) (collectively, Appellees) sued Vanessa Velez Labrado for malicious prosecution. Leith and Laboe sued Vanessa for abuse of process. Three R's also sued Vanessa for tortious interference with a contract. Vanessa answered and filed a counter-suit against Appellees, alleging assault and

battery, intentional infliction of emotional distress, and breach of fiduciary duty. She later non-suited these claims.

Following a jury trial on the claims for malicious prosecution, abuse of process, and tortious interference, the trial court entered judgment in favor of only Leith and Laboe.[1] On appeal, Vanessa (1) asserts she conclusively proved her defense of absolute immunity through the judicial-proceedings privilege and the immunity granted in Family Code § 261.106; (2) the trial court erred by not properly instructing the jury on her immunity defenses; (3) the evidence is legally insufficient to support the jury's finding on malicious prosecution; (4) the evidence is legally insufficient to support the jury's finding on abuse of process; and (5) the evidence is legally insufficient to support the jury's finding on damages. For the reasons explained below, we reverse the trial court's judgment and render judgment that Leith and Laboe take nothing.

## I. THE PARTIES

Leith and Vanessa married in June of 2011, and had a son (L.L.) and a daughter (E.L.).[2] Laboe is Leith's brother, Richard Velez is Vanessa's brother, and Lourdes Velez is Vanessa's and Richard's mother. Laboe runs Three R's. Laboe was in a relationship with Melissa Dozal who had two children, N.D. and D.D., who are homeschooled at Three R's.[3]

---

[1] The jury answered "no" to the questions of whether Vanessa (1) engaged in malicious civil prosecution against Three R's and (2) intentionally interfered with Three R's daycare contract.

[2] L.L. was born on March 31, 2013. E.L. was born on September 5, 2017. To protect the identity of the children referenced in this opinion, we will refer to them by their initials. *See* Tex. R. App. P. 9.8(b).

[3] Throughout the record on appeal, these children are often referred to as L.L.'s cousins or step-cousins although they are not related. The children of Melissa Dozal are sometimes identified with the Labrado last name, the Dozal last name and with both. We use "Dozal" and the abbreviated "D" for consistency to identify the children, N.D. and L.D. At the time of the alleged incident, N.D. was twelve years old and D.D. was eleven years old.

## II. PROCEDURAL BACKGROUND

On November 14, 2019, Vanessa filed for divorce.[4] In her divorce petition, Vanessa asked for an ex parte restraining order that, among other things, would exclude Leith from possession of or access to L.L. and E.L. Vanessa attached her affidavit to the divorce petition and she made the following allegations:

> On May 24, 2019 [L.L.] told me [Vanessa] . . . that Laboe . . . "pulls my hair when I'm practicing (golf) and tells me to keep [my] eye on the ball." [L.L.] also shared with me that Laboe scares him by hitting the cardboard with the golf club. . . . I sent a text message to my husband (Leith Labrado) informing him of what [L.L.] had just finished sharing with me and my concerns with what was happening while [L.L.] was at the daycare with Leith and Laboe Labrado. Leith will go to the daycare (Three R's) after picking up [L.L.] from school and spend time there before coming home. I told Leith in the text message "no wonder [L.L.'s] been peeing the bed and saying he's scared." I also included in the text message that I could not believe he would let this happen. I informed Leith through the text message that he is to "keep [L.L.] away from Laboe or I would report Laboe and press charges on him." I told Leith in the text message he (Laboe) "is NOT allowed to put his hands on our son or inflict fear into him." Leith proceeded to reply to me "what's wrong with you" . . . "you have no clue what you're talking about" . . . "clueless." I replied to the text messages and stated "keep my son away from Laboe. Bottom line. This is not a threat either." [L.L.] had been wetting the bed at night for two weeks in a row, but would not share with me or open up to me. I even took [L.L.] to see his pediatrician to make sure there was no [underlying] medical condition causing his bed wetting, such as a Urinary Tract Infection – which he was negative; overall healthy. Later come to find out he was afraid of his uncle Laboe.
>
> On Friday, November 8, 2019, I spent the night at my mother's house because [L.L.] asked if we could stay the night. I put the baby [E.L.] to sleep and fell asleep as well. My mother later came to the bedroom and woke me up telling me [L.L.] was upset and crying. I went to the den to check on [L.L.] and found him sitting at the dining room table with his head on the table, [he] was crying, and [he] was visibly upset. When I asked [L.L.] what was the matter, he would not tell me. I comforted him and took him to bed. The next day, November 9, 2019, I attended a work event in the evening and [L.L.] stayed with my brother (Richard Velez). Richard is visiting from Chicago, IL and is [L.L.'s] Godfather. . . . Richard informed me he asked [L.L.] why he had gotten so visibly upset the night before and [L.L.] made an out-cry to my brother. That evening, . . . Richard shared what [L.L.] had told him. I informed Richard, [L.L.] made the out-cry of abuse and he had to make the report to Child Protective Services. [L.L.] had a golf tournament

---

[4] The divorce proceeding was still pending at the time of the underlying trial.

3

the next day, November 10, 2019 and I did not feel it was appropriate to discuss this with him at that time. On November 11, 2019, I picked up [L.L.] from school and we went to Wal-Mart. . . . [L.L.] asked me where we were going and I told him to Wal-Mart and he asked me if his "Nino" Richard told me about what he told him . . . about [N.D. and D.D.] and Laboe." I said "no, what is he supposed to tell me." [L.L.] then asked me to ask his Nino. Later that afternoon, [L.L.] and I picked up Richard and went to Village Inn to talk about what was going on. At Village Inn, [L.L.] told me that when he goes to the Three Rs daycare with his papa, he'll be doing his homework in the office and his cousin [D.D.] would wrench his arm back up to his shoulder to the point where he jumps out of the chair, then his cousin [N.D.] goes in front of [L.L.], grabs his genitals (penis and "nuggets") and would squeeze, pull and twist them until [L.L.] began to cry. [L.L.] then said when he would start to cry and want to yell for help; [D.D.] would cover his mouth while still holding his arm up his back. [L.L.] informed me he once tried to tell his papa, but Laboe was standing next to him and he decided not to say anything because he is afraid of Laboe. [L.L.] also said he told his papa about what was happening and his papa told him "do not say anything to mama, this is our secret, and if you tell her I will make you pick up the dog poop for a year."

On November 12, 2019, Brenda from Child Protective Services (CPS) contacted me to ask me for permission to go to [L.L.'s] school to speak with him. She also informed me she needed to do a home visit and speak with me. At 1600, Brenda met me at my house for the home visit. Brenda informed me [L.L.] made an out-cry of what his cousins had done to him. She also informed me that [L.L.] told her his "papa can be a little too rough on me, like kicks me off the couch for no reason, hurts me and curses at me a lot, like keep your eye on the F(ing) ball, etc.["] I informed my husband CPS needed to do a home visit and would be coming to the house, he did not ask me for the children, nor if I knew what was happening, nor if everything was okay. Instead he showed up to the house to meet with CPS with his attorney and his paralegal. CPS informed me since the other children are 11 and 12 years old, and [L.L.] made the out-cry of physical abuse and grabbing of his genitals on multiple occasions, she would be notifying law enforcement. I told her I agreed with her decision.

Vanessa concluded her affidavit with a request for a restraining order:

I believe that my husband will pick up [L.L.] and harm him, again. I believe that Leith will take [L.L.] to be around Laboe, [N.D.] and [D.D.] unless the Court gives me a restraining order that prevents Leith from picking up the children. [L.L.] attends Loretto Academy and he may attempt to pick him up from school. I believe that Leith will pickup my daughter, [E.L.] and keep her from me as punishment to me and [L.L.] for having called CPS and [the] El Paso Police Department. I know that Leith will pick [up E.L.] and take her to Laboe's day care and have her exposed to [D.D.] and [N.D.] For that reason I am asking the court for a restraining order to prohibit Leith from picking up [E.L.] from any one at any location.

4

On November 14th, the trial court signed a temporary restraining order that, among other things, restrained Leith from taking L.L. and/or E.L. into his possession and from withdrawing the children from their school, Loretto Academy, from daycare, or Lourdes's residence. The order set December 6, 2019, as the date for a hearing to determine whether the temporary restraining order should be made a temporary injunction pending final hearing.

On December 6, 2019, as part of the divorce proceeding, Vanessa filed two applications for a protective order (one as to Leith and the other as to Laboe) and attached the same affidavit to both applications. In her affidavits, she made the following allegations:

> When [L.L.] was about 4 years old, Leith and I decided to move [him] into his own bedroom as we were expecting the birth of [E.L.] Initially, Leith would put [L.L.] to bed and then come back to the master bedroom to sleep. After the birth of our daughter [E.L.], in approximately October 2017, Leith began to sleep with [L.L.] every night. He was sleeping with [L.L.] in the nude. I told Leith not to sleep with [L.L.] in the nude but, he refused, so I moved [L.L.] into the master bedroom to be with me and [E.L.]. Although Leith and I were living in our home on Blacker, we were separated in the home after that time and continued to be separated until I left the home with my children on November 12, 2019 as a result of an outcry that [L.L.] made to my brother, Richard Velez, that has led to a CPS investigation and a criminal case. However, prior to leaving the house Leith had engaged in additional disturbing behavior, specifically, in August or September 2019, I found Leith taking a shower with [E.L.] although he had always bathed her in her own tub before that time. I saw him standing in the shower with [E.L.] who was also standing and his penis was at the level of her face. I told him that was inappropriate and I bathed [E.L.] every time thereafter.

> On November 9, 2019 [L.L.] made an outcry to my brother Richard Velez that he had been hurt by [D.D. and N.D.], his step cousins. Specifically, that [D.D.] had grabbed his arm and placed it behind his back and [N.D.] grabbed his testicles. My brother called CPS and an investigation began. On November 12, 2019 the CPS investigator, Brenda Salayandia, contacted me so as to interview me and Leith. I arranged to meet her at the house and told Leith that she also wanted to interview him. When I showed up at the house Leith was present at the house with his attorney, David Leffman. I was then interviewed by the CPS investigator. The CPS investigator then interviewed Leith in the presence of Mr. Leffman. [L.L.] also told the CPS Investigator that he was afraid of Leith and that Leith had kicked him off the couch. On November 27, 2019 [L.L.] told his counselor, Dante Jiminez, that Laboe Labrado was present at the time [that D.D. and N.D.] hurt him.

5

As a result of the case with the El Paso Police Department Crimes against Children, [L.L.] was interviewed by Max [Zimmerly] on December 5, 2019 and I know that [L.L.] told Mr. [Zimmerly] [what] he told me later that day. When I was putting [L.L.] to bed on December 5, 2019 he made an outcry of abuse and neglect to me against his father and Laboe Labrado. [L.L.] told me that on several occasions, as punishment, Leith would pick him up and raise him over his head and then would drop him causing him to hit the ground, hurting him. [L.L.] also told me that his uncle Laboe has grabbed his testicles on more than one occasion, in the presence of his father, and his father did not protect him. Leith told [L.L.] not to tell me what Laboe had done and threatened him that I could not protect him because I was [a] "fucking piece of shit". [L.L.] also told me that Laboe told [L.L.] that if he told me, Laboe would call the police and tell them I had stolen something like a vase and a ring.

Since the outcry by [L.L.] to my brother, and our separation from [Leith] on November 12, 2019, Leith has repeatedly ask[ed] to see and speak to [L.L.] Leith did not [ask] to see [E.L.] until this past weekend when I offered to meet him with her at Village Inn. [L.L.] has refused to speak to his father, becoming very anxious when he calls, biting his nails and becomes tearful, and does not want to hear his voice even when he has called to speak with [E.L.] I now know that Leith had committed acts physically and emotional[ly] hurt [L.L.] and has failed to protect him from the sexual assaults by Laboe Labrado and [D.D. and N.D.].

On December 6th, the trial court signed two ex parte protective orders, one against Leith and the other against Laboe. In both protective orders, L.L. was identified as the "Protected Person."

On November 9, 2021, Appellees sued Vanessa. They alleged that Vanessa made false claims of outcries about abuse of L.L. by Leith, Laboe, and/or D.D. and N.D. in her affidavits. All three Appellees alleged a claim for malicious prosecution as follows: (1) (a) a civil proceeding (the divorce case and contemporaneous requests for a restraining order and a protective order) was instituted or continued against Leith, (b) civil protective order proceedings were instituted or continued against Laboe, and (c) administrative proceedings were instituted against Three R's; (2) the proceedings were instituted or continued by or at the insistence of Vanessa; (3) Vanessa acted with malice; (4) Vanessa did not have probable cause for the proceedings; (5) the proceedings were concluded in Appellees' favor; and (6) Appellees suffered special injury.

6

Leith and Laboe alleged a claim for abuse of process as follows: (1) they were served with valid process and as parties to the divorce case and protective order case(s); (2) Vanessa made an illegal, improper, or perverted use of the process after it was issued by executing the affidavits of November 14, 2019 and December 6, 2019 to obtain the restraining order and protective orders; (3) Vanessa had an ulterior motive or purpose in using the process to obtain the restraining order and protective orders, namely to obtain an advantage in the divorce case for the purpose of obtaining custody of the children; and (4) they suffered injury as a result of the improper use.

## III. TRIAL ON THE MERITS

A six-day jury trial on Appellees' claims commenced on January 26, 2024, at which several witnesses testified, and numerous exhibits were admitted into evidence.

### A. Leith's testimony

Leith testified he was a "very involved parent" with L.L., that he helped with bottle-feeding and changing diapers, and attended all the doctor's appointments and school functions. He said he and Vanessa shared in all the activities. Leith stated he and L.L. went to parks, Disneyland, and golf tournaments together. He also helped with E.L. to a lesser degree because he would take L.L. to work with him while Vanessa was in school and E.L was cared for by Vanessa's cousin.

Leith testified that he and Vanessa had money problems and would have "pretty bad" arguments. He said she told him she knew "the attorneys, the CPS, [and the] police department" and she would take the children away from him so she could "live in peace." Around November 12, 2019, following Richard's report of L.L.'s November 9th outcry, Vanessa sent Leith a text message informing him that CPS had been called and would conduct a home interview. Leith said Vanessa did not tell him why CPS wanted to interview him, and her text message said only that she had "to find out what's going on." When he arrived home, CPS was already there interviewing

7

Vanessa. Also present were Vanessa's brother, Richard, and L.L. At some point, Richard and L.L. left the house. Leith said CPS interviewed him. That night he, Vanessa, and E.L. stayed at their house and L.L. stayed at Lourdes's house. Leith said the allegations made to CPS did not pertain to him, but involved allegations that D.D. and N.D. had twisted L.L.'s arm behind his back and grabbed his genitals. Leith said outcries were allegedly made on November 9, 2019, and December 5, 2019. Leith said Vanessa later made allegations against him, but he did not elaborate on the nature of the allegations. Leith denied that he ever slept in the nude with L.L. On December 6th, Leith was required to move out of the family residence and he eventually moved in with Laboe. Leith said L.L. was six years old and E.L. was two years old the last time he saw the children.[5]

On April 30, 2020, the Texas Department of Family and Protective Services (DFPS) sent Leith a letter that stated allegations had been made against him on March 11, 2020, that he physically and sexually abused D.D. and N.D., and a finding of "ruled out" had been made on each allegation. The letter explained that "[a] finding of 'Ruled Out' means that, based on the available information, it was reasonable to conclude that the alleged abuse or neglect did not occur." On April 30th, DFPS sent Leith a letter stating the physical and sexual allegations against him, Laboe, D.D., and N.D. had been administratively closed. The letter explained that "[a] finding of 'Admin Closure' means that, based on available information, continued intervention by DFPS is unwarranted and no other findings will be made regarding the allegation."

Leith said he has been in therapy and the reunification process with his children has started. He said his greatest fear was that it could take years to regain a relationship with his children. He

---

[5] At the time of the 2024 trial, L.L. was 11 years old and E.L. was six years old. Since November 2019, Leith had one Zoom call with L.L. and a counselor.

stated he often could not sleep or eat, and his work and daily life were affected. Leith stated his malicious prosecution claim was not based on Vanessa filing for divorce. He said his abuse of process claim was based on Vanessa making false intake reports to CPS, the El Paso Police Department, and in open court under oath.

### B. Laboe's testimony

Laboe said he grew up in the daycare business, which was started by his parents in 1977, and he currently runs the Three R's facility. Laboe said Vanessa also made allegations against him and Three R's. He contended her first allegation was that he grabbed L.L., twisted his arm, and then punched him in his "private parts." In April 2020, she alleged he slammed L.L.'s head into a golf mat, stood on his head on the golf mat, punched him in the golf mat and, while holding him down, pulled off his pants, and stuck a fork in his anus.[6] Vanessa alleged the children were not supervised at Three R's and the alleged abuse occurred at Three R's. Laboe stated this was the allegation that resulted in him having to leave Three R's for several months.

Laboe said an investigation was initiated by Vanessa against him and/or Three R's "because of a claim made by " Vanessa. Although CPS did not interview Laboe, Texas Health and Human Services (HHS), which regulates, monitors, and investigates childcare facilities in the State of Texas, initiated an investigation. Laboe stated Three R's was inspected and he was interviewed on November 19, 2019, and on April 8, 2020. Laboe said HHS interviewed the Three R's teachers, the children, their parents, and interviewed N.D., D.D., and Melissa. He said the allegations made against him made him feel "[v]ery embarrassed, very upset, very frustrated, and very[,] very sad." He claimed that, because of Vanessa's allegations, HHS made the decision that he could not go to

---

[6] On cross-examination, Laboe said Vanessa made these allegations against N.D. and D.D. He also said he did not believe Vanessa stated, in a police report or to CPS, that she saw or witnessed any abuse by him individually.

9

Three R's for about five and a half months in 2020. Laboe explained that after the April 5th allegations, on April 21, 2020, HHS sent him a letter that stated in part:

> Based on the results listed below, you are INELIGIBLE to be present at a child care operation:
>
> An OPEN investigation involving allegations of Sexual Abuse.
>
> The history listed above includes findings or charges that are pending. The operation may resubmit your background check request after the abuse/neglect investigation has been closed or the pending criminal matter has been resolved.
>
> Based on the results, the CBCU has determined that your presence at the operation presents a risk to children in care. You are not eligible for a risk evaluation at this time.
>
> Laboe claimed Vanessa made numerous allegations of outcries by L.L.—during a

December 6th court hearing, several times to police detectives, in CPS in-take calls, and in her affidavit to the divorce petition. The CPS investigations of him and of N.D. and D.D. were closed in March 2020.

On April 30, 2020, DFPS sent letters to Laboe and Melissa stating that allegations had been made against Leith and Laboe on March 11, 2020, that they physically and sexually abused D.D. and N.D., and a finding of "ruled out" had been made on each allegation. The letters explained that "[a] finding of 'Ruled Out' means that, based on available information, it was reasonable to conclude that the alleged abuse or neglect did not occur." DFPS also sent letters to Laboe, N.D., and D.D. stating the investigations into the allegations of sexual abuse of L.L. had been administratively closed. The letters explained that "[a] finding of 'Admin Closure' means that, based on available information, continued intervention by DFPS is unwarranted and no other findings will be made regarding the allegation."

On July 30, 2020, DFPS sent Laboe a letter stating that he played "no role" in the alleged incident and the investigation was closed. On August 10, 2020, HHS sent him a letter stating a finding of "no deficiencies" based on an investigation of a report "alleging that children were

10

touched inappropriately while in care." Laboe was asked about the information posted on HHS's website:

Q. Okay. How long do the investigations that are conducted by the child care licensing stay on the child care licensing website?

A. When an investigation is started, licensing comes, starts the investigation. That date is posted onto the website of the Health and Human Services child care licensing under the search "child care." So it's from the date when it started. It includes the date when it was completed. And then it's two years after that, they keep that, the whole investigation, the findings on the website.

Q. What information is put on the website?

A. The allegation. During the investigation, it will state "investigating." Once there's a finding, they place the finding also on there, whether there was a deficiency or no deficiencies, if it was corrected or not corrected. And that's the one that's kept on for two years.

Laboe said the website is used by prospective client parents who may want to research a daycare for any deficiencies, misconduct, or investigations. Laboe stated that after the allegations were made against Three R's and the information was posted on the agency's website, Three R's saw a decline in student enrollment over a period of two years. The decline equated to 30 to 35 children. A per-child profit amounted to about $3,500.

Laboe said he was humiliated, mad, extremely sad, and it "was one of the most horrible experiences [when he] had to tell [his] parents." Laboe said that because of the allegations made against him, he experienced loss of sleep, weight loss, extreme duress, constant fear, and physical illness. He said his professional reputation also was harmed. He said he also suffered mental anguish over what Leith was experiencing.

**C. Vanessa's testimony**

Vanessa testified that for the past 9 years she was the director and nurse-practitioner for the Child Abuse Resource Education and Services Clinic at El Paso Children's Hospital. She is also a certified sexual assault nurse examiner (SANE).

11

Vanessa was asked about the allegations she made in her affidavit attached to her divorce petition:

Q. But you say, "Later come to find out, he was afraid of his uncle Laboe."

A. Correct.

Q. I assume when you say that, you're referring to something he may have told your brother Richard?

A. No. This was what [L.L.] had told me about what we just discussed.

Q. So even though [L.L.] is saying that he's scared when Laboe hits the cardboard, not because Laboe is trying to scare him, your conclusion was that he's scared of Laboe?

A. That's one component of it, yes.

Q. Well, that's what you say in your affidavit, the very last sentence on this page, isn't it?

A. Yes. But may I --

Q. Is that what you say, Ms. Velez?

A. Yes.

.        .        .

Q. You do admit that your husband Leith never did anything like you're describing in this affidavit where Laboe was holding [L.L.'s] head. Right? You don't say Leith did anything like that?

A. No.

.        .        .

Q. You understand the question? I know you don't believe [Leith] was protecting [L.L.] on those occasions. My question to you is: In this affidavit, you don't make any claim that Leith did any affirmative act to physically harm your child, do you?

A. I would disagree with that.

Q. Is there some place in this affidavit where you claim that Leith physically harmed Lucca?

A. By not protecting him.

Vanessa said that when Richard contacted her to tell her about L.L.'s outcry on Saturday, November 9, 2019, she decided not to ask L.L. about the details. She allowed L.L. to go to golf practice with Leith on that same day because Richard did not inform her about the alleged outcry

12

until Saturday evening around 10:00 p.m. She also allowed L.L. to go to a golf tournament on Sunday with Leith, where she knew N.D. and D.D. would be present, because she "knew the consequences if he didn't go." Vanessa also was asked about allegations in the CPS report[7] that "[L.L.] is scared of [Laboe] . . . [b]ecause [Laboe] pulled his hair when they went golfing and told [L.L.] to put his head down"; "[i]t hurt all day when [L.L.'s] hair was brushed"; and "[L.L.] said his genitals [were] red and swollen and it hurts to sit down, pee, or shower." Vanessa said Richard told her these allegations were based on what L.L. had told him. Despite being informed about the allegations and saying she was "concerned," Vanessa admitted she did not check L.L.'s genitals that evening or ask him about it the next day. She said L.L. did not cry out in pain when she combed his hair and he was not in any apparent distress.

Vanessa admitted the statement in her affidavit attached to her application for a protective order that "[L.L.] also told the CPS investigator [Brenda Salayandia] that he was afraid of Leith," was not something Salayandia reported in her narrative of her interview with L.L. Vanessa claimed Salayandia told her about this when she and Salayandia met on November 12th. She admitted she did not report to any agency the outcries L.L. allegedly made to her. Instead, the alleged outcries appeared only in her affidavit for a protective order. However, Vanessa was interviewed by Salayandia during the CPS investigation. The interview, contained in the CPS report, is as follows:

> [Vanessa] stated that her brother is visiting and him and [L.L.] are super close. [She] stated that her brother is [L.L.'s] nino or godfather. She stated that they spent the night at her mom's house on Friday night because [L.L.] asked her to spend the night with him at her mother's. She stated that she decided to stay with him as he had told her about a dream he had that morning about something bad happening to him. She stated that she put the baby to sleep and went to sleep herself. Her brother, her mother, and [L.L.] stayed awake. She stated that her mom came to her and told her to check on [L.L.] because he was crying. She stated that she went to him and he was laying his head on the table crying and was visibly upset. She explained that [L.L.] is in martial arts and her brother was in martial arts for a lot of years. Her

---

[7] The CPS reports were admitted into evidence.

brother told her that they were talking about martial arts and her brother asked the child [if] he wanted him to show him a martial arts move and [L.L.] said no and became visibly upset. [Vanessa] stated that she asked [L.L.] what was wrong and he would not talk so she left it at that. She stated that on Saturday she had to go to a gala for her work so she left. She stated that around 9:30AM, her brother reached out to her and told her that she needed to talk to her in person. She stated that she went to her mother's house after the gala and her brother told her that he took [L.L.] to go buy a video game. He stated that before they came out of the car, her brother asked [L.L.] AKA Bubba if he could talk to him and [L.L.] said yes. She stated that [L.L.] told her brother everything about what his cousins do to him.

.        .        .

From what she knows, [D.D.] will wrench [L.L.'s] arm behind his back to where the child stands up because of the pain and at that time, [N.D.] will grab and twist his penis and his testicles until he starts crying. [D.D.], while still wrenching his arm, covers [L.L.'s] mouth so no one can hear him. She stated that [L.L.] told her that he did try to tell his dad, but his uncle [Laboe] was next to his dad and [L.L.] is afraid of [Laboe]. On another occasion, she stated that [L.L.] told her that he did tell his dad and his dad told him not to tell mom otherwise he would make [L.L.] pick up dog poop for a year. She stated that [L.L.] told her brother that [D.D.] had grabbed his penis through his. (Record ends here).

.        .        .

She stated that [L.L.] also said that his uncle [Laboe] also grabbed his hair, pulled it down, and said "keep your head down." She stated that [Laboe] also hit a cardboard box with his golf club while they were practicing golf and scared [L.L.]. . . . She stated that Leith does cuss at [L.L.] and he does push [L.L.] off the couch sometimes. She stated that this is to the point where she has to try to physically be at golf with [L.L.] to defend him. She stated that her brother told her everything and [L.L.] would chime in and validate it. [S]he stated that after this she went to her attorney on Monday and filed for divorce. Stated that Leith keeps saying that it's custody but it is about her child being safe. She stated that sometimes [L.L.] would bed wet and she did notice him grabbing his penis a couple of times and asked him about it. She stated that the child told her it was just itchy.

Vanessa acknowledged that on December 10, 2019, Yvette Shibley, with CPS, told her that "law enforcement was not allowing her [Shibley] to move forward with the investigation," therefore, CPS "could not keep the case open[.]"[8] Vanessa testified that in March and April of

---

[8] Shibley's report stated: "I advised mother that detective did not grant me permission to interview perpetrators on case as it may impede their criminal investigation. I advised mother [that CPS] cannot keep case open to accommodate criminal investigation timeframes. I advised mother case would be closed with a disposition of Unable to Determine. [Mother] stated the evening after the forensic interview, child made a new outcry. She stated she called Detective Zamora to advise[ ] her about new outcry and the detective told her to keep taking child to counseling that with time her son will be able to talk about allegations and provide details."

14

2020, additional outcries of alleged sexual abuse of L.L. perpetuated by Leith and Laboe were reported to CPS. Although Vanessa believed her son, she waited until February 2021 to have him examined by a doctor. However, she explained that about two weeks after the first outcry made by L.L. to Richard in November 2019, she took L.L. to his pediatrician, Dr. Lourdes Asiain.

### D. Richard's testimony

Richard testified that, for the past three years, he has lived in El Paso with Vanessa and her two children, his mother Lourdes, and his mother's boyfriend. Before moving to El Paso, he lived in Chicago. In 2019, he was in El Paso from Chicago visiting at his mother's house when he made the report of L.L.'s outcry to CPS on November 11th at around 12:40 p.m. Richard was interviewed on November 11th at around 3:40 p.m. by a CPS "worker." Richard agreed he gave the statement contained in the CPS report alleging L.L. made an outcry to him that D.D. and N.D. were twisting his arm and pulling his pants down while they were at Three R's. Richard said he was sincere in making the report and it was "absolutely" necessary that he make the report.

### E. Investigators' testimony

Investigators for CPS and an El Paso Police Department Detective testified about investigations into various outcries allegedly made by L.L.

#### (1) Amanda Martinez's testimony

Amanda Martinez, a CPS investigation supervisor, testified about the investigation into the outcry regarding abuse of L.L. that was reported on November 11, 2019. Martinez said she was the supervisor on the initial November 2019 outcry report. Salayandia[9] was the initial investigator and, after Salayandia left, Shibley took over the investigation.[10] Martinez stated that by law CPS

---

[9] Salayandia reported the first outcry to the El Paso Police Department on November 12, 2019.

[10] Martinez was called to testify because neither Salayandia nor Shibley were available.

is not allowed to identify the person who reported the outcry and nothing in the CPS report identified Vanessa as the person who made the initial report of child abuse against Leith, Laboe, or Three R's.

Martinez reviewed Salayandia's November 12th interview with L.L. (at his school) in which L.L. told her:

> [L.L.] [s]tated that he last saw his dad yesterday and today. He stated that he sees his dad "mostly all the time." . . . [L.L. stated] that he likes that his dad is always silly.
>
> .      .      .
>
> In regards to the allegations, [L.L.] said that his cousins are kicking him because they are bullies. Stated that they were twisting his arm and punching him. He did not know when it happened but it has happened anywhere from two to six times. His cousins pull down his pants and laugh at him, they squeeze his "pee pee" really hard. He stated that this happens at the office and no one is there when it happens. He stated that sometimes his dad is fixing something outside and [L.L.] is inside the office doing his homework. [L.L.] stated that he told his mom, his nino, and his abuela about this. He stated that he never told his daddy that this was happening and has not told his aunt and uncle about this. He said that [Laboe] was being mean to him by pulling his hair and hitting him. He stated that [Laboe] hit him in the arm and in the heart/chest area. He stated that [Laboe] punched him really hard. He stated that this is all that [Laboe] has done. He stated that his dad was there when [Laboe] was hitting him but did not do anything. [L.L.] stated that he knows what his private parts are and was able to point to them. He stated that apart from what he disclosed to me, no one else has ever touched his private parts or asked him to touch their private parts. He stated that if anyone ever did he would tell his mom or his nino. [L.L.] told me he had some light scratches to the right side of his face and stated that nobody hurt him, he got the scratches from playing outside with his friend. No other marks or bruises were observed on the child's body. [L.L.] was observed to be safe, clean, and well-dressed.

Martinez agreed that the statements of both the initial reporter and Vanessa,[11] in their interviews with CPS, that L.L. said his father would make him pick up dog poop for a year was

---

[11] The CPS report indicates Salayandia interviewed Vanessa on November 12, 2019. Vanessa told Salayandia what she had been told about the initial outcry made by L.L. to Richard. She also told Salayandia

> that [L.L.] also said that [Laboe] also grabbed his hair, pulled it down, and said "keep your head down." She stated that [Laboe] also hit a cardboard box with his golf club while they were practicing golf and scared [L.L.]. . . . She stated that Leith does cuss at [L.L.] and he does push [L.L.] off the

16

not in L.L.'s interview. Martinez stated the investigation into the November 2019 outcry ended with a finding of "unable to determine," which she explained as follows:

> We work on a preponderance of the evidence. So we have to have 51 percent evidence . . . that something occurred or did not occur. So in this case, we did not have enough evidence to say something did or did not occur, which is why we ruled it as unable to determine. It's essentially saying we didn't have enough to make a decision.

She explained that because a criminal investigation was on-going at this time, CPS could not interview the alleged perpetrators; therefore, CPS "didn't have enough to make a determination." She said that by law, they were required to close their investigation within 30 to 45 days. The initial investigation was closed in December 2019. Martinez stated the criminal case was separate from the CPS investigation, and the criminal investigation remained open until it was later put on inactive status.

### (2) Aaron Anthony Flores's testimony

A second investigation by DFPS investigator Aaron Flores began in March 2020. Flores said he conducted the March 14, 2020, investigation into an outcry made to CPS on March 6, 2020. During his investigation, he spoke with Vanessa and L.L., but he was not allowed to interview any of the alleged perpetrators. He also was in contact with Detective Adrianne Zamora of the El Paso Police Department during his investigation. He did not dispute that, as of his March 14, 2020

---

couch sometimes. She stated that this is to the point where she has to try to physically be at golf with [L.L.] to defend him. She stated that [Richard] told her everything and [L.L.] would chime in and validate it. [S]he stated that after this she went to her attorney on Monday and filed for divorce. [She stated] that Leith keeps saying that it's custody but it is about her child being safe. She stated that sometimes [L.L.] would bed wet and she did notice him grabbing his penis a couple of times and asked him about it. She stated that the child told her it was just itchy.

The report also indicates Shibley spoke to Vanessa on December 10, 2019. According to Shibley's notes, Vanessa "stated the evening after the forensic interview, [L.L.] made a new outcry. [Vanessa] stated she called Detective Zamora to advise[] her about new outcry and the detective told her to keep taking child to counseling in hopes that with time her son will be able to talk about allegations and provide details." Shipley's notes do not indicate the details of the alleged new outcry.

17

interview, Leith had had no contact with L.L. since November 2019. According to Flores's report, during his March 14th interview with L.L., L.L. made abuse allegations against Leith, Laboe, N.D., and D.D. The report also stated L.L. "presented as euthymic, oriented, and articulate." During Flores's interview with Vanessa, she did not make any new allegations. The investigations into Leith, Laboe, N.D., and D.D. were later administratively closed.

Flores said the investigations related to L.L. prompted concerns about the safety of N.D. and D.D.; therefore, an investigation was initiated on March 11, 2020, relating to those children.[12] For this investigation, Flores investigated for CPS and he worked with Luis Ceballos who investigated for HHS. Flores's report stated there was not a preponderance of evidence that N.D. and D.D. remained in imminent danger of sexual or physical abuse by Leith and/or Laboe; and the risk level was moderate.

Another investigation was initiated regarding allegations of abuse of L.L. that were reported on April 8, 2020, following an outcry reported to CPS on April 7th. This investigation involved an April 5th outcry L.L. allegedly made to Lourdes that Leith and Laboe, utilizing gloves, penetrated L.L.'s rectum while under Leith's care at Three R's. Flores's report stated:

> On April 8th 2020, [Ceballos] initiated contact with detective Zamora who informed Mr. Ceballos that Zamora has been investigating the case since late [] last year 2019, is aware of the new allegations and that the family appears to be going through a bad divorce. Mr. Ceballos was informed that a forensic interview was previously scheduled and no outcry was made of his uncle Laboe, or his cousins, [N.D. and D.D.], of inappropriately touching [L.L.'s] penis. It was reported that the child had not made such outcry to his therapist, Lydia. It is believed that the new information may be coming from the mother, Vanessa Velez.
>
> .     .     .
>
> On April 8th 2020, . . . [Laboe] informed Mr. Ceballos that the allegations are a blatant lie, stated that Vanessa and [Leith] are undergoing a "bitter" divorce as of last year, November 2019. Mr. Ceballos was informed that Vanessa works [as] a

---

[12] The investigation was based on allegations of sexual and/or physical abuse of one or both children.

18

director for child abuse and believes that Vanessa may be using her influences with [CPS] and Law Enforcement.

On April 8th 2020, . . . [Leith] denied the allegations. [Leith] identified Vanessa as favoring her divorce by claiming false accusations. Mr. Ceballos was informed that the family may be going through a divorce due to money issues.

.     .     .

[N.D.], Mother, Melissa, step-father, Laboe, and paternal uncle, Leith, were all interviewed by [Ceballos], and all allegations were denied. After [Ceballos] and I consulted with CAC [crimes against children], detective Zamora, we were informed that Zamora was aware of the allegations, and believes the family is going through a bad custody divorce. CAC, Detective Zamora, at this point in the investigation believes mother may be doing her own investigation and coaching child, [L.L.], to keep full custody of the child.

Flores stated he did not believe he documented the statement about Vanessa doing her own investigation or coaching L.L. in the report. Flores noted Zamora requested that L.L. continue in therapy.

### (3)  Luis Alberto Ceballos's testimony

Luis Ceballos testified he works for HHS, and, in April 2020, he investigated Three R's. He explained that if there are allegations of abuse and neglect occurring at a daycare facility, then it would have been his duty to investigate. He said his involvement with the case covered April 7th through April 10th, after which he transferred to another position and another investigator took over the investigation. He knew L.L. was not enrolled in Three R's at the time but would visit Three R's with his father in the back office with Laboe.

Ceballos said his investigation resulted from the April 7, 2020 outcry report, which involved allegations that Laboe and Leith "both poked [L.L.'s] butt area," and "[L.L.] was straddled on the ground and that they would take pictures of him with no clothes and that they would put the pictures on the computer." However, when interviewing Vanessa, she revealed to Ceballos "that there were previous reports that were not on [his] report" and "some of the other

19

allegations from the past were that [N.D. and D.D.] were bullying [L.L.] and also at some point . . . [L.L.] mentioned that Laboe touched his penis." He said the purpose of his investigation was to determine if there was any sexual abuse occurring within the daycare facility.

Ceballos said he was not allowed to reveal the identity of the person who reported the outcry. The reporter indicated that "there was a possibility that this [poking by Leith and Laboe] could have been happening either at the daycare or in the office of the daycare." He said Vanessa did not say anything that he interpreted as being malicious, she was professional and appropriate, and she cooperated. He did not speak with L.L. because there was a law enforcement forensic interview in December 2019 and HHS did not want to conduct multiple investigations for the same allegations. He was aware of the "unable to determine finding" regarding Three R's, although he was not the one who made the finding because he did not conclude the investigation.

Ceballos agreed with Flores's report that he and Flores had met with Zamora. When asked if he agreed with the contention that Vanessa "was doing her own investigation and coaching the child," he responded, it was "just an opinion" but "[t]here's some motive because there's a custody dispute going on." Based on his investigation and his interactions with Zamora and Flores, his opinion was that Vanessa was possibly coaching L.L.

Ceballos testified about his notes as contained in the CPS report.[13] He said in his notes that "on the night of April 5th, 2020, [L.L.] was found in the restroom crying and claiming that his butt was hurting (itchy) because of his father, Leith, and uncle Laboe" and "that both [Leith] and Laboe stuck their finger in his butt while being cared for by [Leith] at Three R's Daycare" were based on

---

[13] Ceballos said he forwarded his notes to Flores but he did not know when his notes were transferred to Flores's CPS report, and he did not know if Flores copied and pasted his notes or if he just entered a summary of those notes. He was "not sure because this is under the CPS information report." He never reviewed these notes for accuracy.

his interview with Vanessa. His notes contained the statement that a previous report was received in March 2020 involving sexual abuse allegations by Laboe, N.D., and D.D. of L.L.

### (4) Detective Adrianne Zamora's testimony

Adrianne Zamora testified she is a detective with the El Paso Police Department, assigned to the crimes against persons unit. She said she was assigned an injury to a child case in December 2019, and the case was closed in August 2020 because L.L. did not provide the necessary details to move forward with prosecution. Zamora said Vanessa contacted her on December 9, 2019, to inform her about an outcry L.L. had made that Laboe "had grabbed his pee pee and that he did not want to talk about it."

Zamora said she was aware of L.L.'s April 2020 allegations about being photographed and the photographs being placed on the computer. She stated the El Paso Police Department did not move forward with an investigation of the April 5, 2020 outcry after a forensic interview was conducted with L.L. She stated the case would be "carried as unfounded" because it did not "meet the elements of an offense for injury to a child, sexual abuse," and "[t]he child did not make a credible consistent outcry." Zamora reviewed the notes from the therapist, the sessions, and both forensic interviews, which were "not consistent." She said that in the first forensic interview, L.L. made an outcry that D.D. and N.D. "were picking on him"; and they would pull his arm behind his back and twist it, pull his pants down, grab his private – front private part, and laugh when they pulled his pants down"; and it hurt.

When asked if she said she was not continuing further with the case because "it was just a nasty divorce or a nasty custody fight," Zamora denied making that statement and said she "would never do that." She also denied telling anyone that she thought Vanessa was doing her own investigation. Zamora was not asked whether she thought Vanessa was coaching L.L.

21

### (5) Therapist's testimony

As part of the divorce proceedings, the trial court appointed Lydia Kasmoch, who is a certified therapist and play therapist. In 2022, L.L. was transferred to another court-appointed therapist, Zul Estrada, who specialized in trauma-informed therapy. L.L. continues to meet with Estrada every two weeks. Prior to Kasmoch's appointment, Vanessa had taken L.L. to another therapist, Dante Jimenez. Only Kasmoch testified at trial.

Kasmoch testified that, at the time the case was sent to her by the court in January 2020, L.L. had not seen his father in several months, and she was appointed to help reunify and remedy the parent/child relationship. She met first with Leith in January 2020 and he attended the first two sessions. She met with L.L. for the first time in early February. When L.L. made an outcry to her on March 6, 2020, during one of her sessions with him and she had to report the outcry to various agencies, she stopped the therapy process with Leith. She stated there were outcries that occurred in her sessions with L.L. "that were more elaborate and different than what had initially happened" in November 2019. She halted the reunification process after the March 2020 outcry because "the nature of the outcries changed." Kasmoch did not think L.L. was parroting what someone else had required him to say, and she continued her therapy sessions with him for over a year. In the Fall of 2022, she referred L.L. to Zul Estrada.

### (6) Expert's testimony

Leith and Laboe called Kamala London as their expert. London testified that typically she is asked to evaluate a case file after something has already happened and examine the factors that led to a child's statement or the type of interviewing that took place and to evaluate the process under which a child made the allegations. She agreed that her goal was not to determine whether abuse occurred, but to assess the trustworthiness of the allegations as they developed over time,

22

the way the allegations came about or unfolded over time, and the extent to which it is consistent with the research on what produces reliable, accurate reports versus unreliable, inaccurate reports. In preparation for her report, London reviewed various pleadings, affidavits, court transcripts, and L.L.'s medical records. London raised several concerns about the informality with which L.L. was interviewed and how his alleged outcries evolved over time. In her report, she stated:

> [L.L.'s] allegations arose during a contentious divorce and custody dispute. Although [L.L.'s] mother, [(]Vanessa) made claims to some mental health, child protection, and court professionals that she filed for divorce as a result of the allegations that came to light on 11-10-2019 about [L.L.'s] cousins. However, the case documents indicate the marriage was troubled before any allegations arose.

> The initial questioning in the informal setting by [L.L.'s] mother and his maternal uncle are highly concerning.

London stated that, based on how L.L. was questioned, she believed the statements by Richard, Lourdes, and Vanessa about what L.L. allegedly told them were "tainted." She explained she was "commenting on the resulting impact on the child's report," in other words, what Richard, Lourdes, and Vanessa said the child said to them. She thought Vanessa had "a preexisting belief that abuse had taken place for some period before [L.L.] ever indicated any abuse had taken place."

### (7) Appellees' closing arguments

Appellees' counsel told the jury that "[w]hen one party uses some kind of civil proceeding or court processes as a sword, this kind of case provides a shield." Counsel stated the law "allows an abuse of process case to protect against their illegal actions" and "allow[s] a malicious prosecution case to guard against malice[.]" Counsel spoke about Vanessa's affidavits, the CPS records, testimony from the trial, and the prior court proceedings. Regarding malicious prosecution, Appellees' counsel argued Vanessa did not have a good-faith basis for her statements. Counsel contended Vanessa acted with malice in initiating proceedings with CPS and HHS. As to abuse of process, counsel contended Vanessa used the temporary restraining order to separate

23

Leith from his children, which then allowed her to obtain her protective order. Finally, counsel argued:

> [Vanessa's attorney] keeps saying that . . . malicious prosecution has something to do with what she testified in court. No, it's the administrative proceedings. It's the CPS. It's the daycare. Yes, she initiated those and/or helped them continue. Look at the actual language. Don't let them get so technical that it confuses you.
>
> .        .        .
>
> On abuse of process, the alternate, the perverted use of that, is that she's trying to take the children away from [Leith]. That's not the purpose of a TRO. That's not the purpose of a protective order."

### (8) Jury charge and judgment

The jury charge instructed the jury on the elements of a cause of action for malicious [civil] prosecution of civil proceedings. The charge informed the jury that Vanessa "has claimed that she is immune from civil liability based on her testimony in the underlying divorce proceedings, resulting in a restraining order and subsequent protective order." As to each of the three Appellees, the jury charge asked whether Vanessa "engage[d] in malicious civil prosecution against [Appellee] when she initiated or continued administrative proceedings with Texas Child Protective Services and the Texas Health and Human Services Daycare Licensing Board[.]" The jury answered "yes" as to Leith and Laboe and "no" as to Three R's.

The charge also instructed the jury on the elements of a cause of action for abuse of process and informed the jury that:

> [a] defendant can assert the defense of immunity to a claim for abuse of process. The law recognizes a person acting in good faith who (1) reports child abuse or neglect, (2) assists in the investigation of a report of alleged child abuse or neglect, or (3) testifies or participates in a judicial proceeding arising from a report or investigation of child abuse, is immune from civil or criminal liability that might otherwise be incurred or imposed for reporting child abuse.

The jury was asked whether Vanessa "commit[ed] abuse of process when she obtained the restraining order or subsequent protective order against Leith Labrado" and whether she

"commit[ed] abuse of process when she obtained the protective order against Laboe Labrado." The jury answered "yes" to each question.

In accordance with the jury's verdict, the trial court signed a judgment awarding Leith $904,390.60 along with taxable court costs and post judgment interest. The court awarded Laboe $60,289.76 along with taxable court costs and post judgment interest.

### (9) Arguments on appeal

On appeal, Vanessa asserts she conclusively proved her defense of absolute immunity through the judicial-proceedings privilege and the immunity granted in Family Code § 261.106; the trial court erred by not properly instructing the jury on her immunity defense; the evidence is legally insufficient to support the jury's findings on malicious prosecution and abuse of process; and the evidence is legally insufficient to support the jury's finding on damages.

## IV.  JUDICIAL-PROCEEDINGS PRIVILEGE

Vanessa contends Leith and Laboe's claims are based on the statements she made to CPS and her statements in her affidavits. She asserts that any statements she made in her affidavits, other pleadings, or other papers filed within the divorce proceeding are protected by the judicial-proceedings privilege and cannot form the basis of a civil cause of action against her—even if the affidavits filed in association with her applications for a temporary restraining order and protective order contain perjured testimony. She also asserts that any statements she made to CPS during the CPS investigation were statements made in a quasi-judicial proceeding with a quasi-judicial body and are likewise protected by the judicial-proceedings privilege and cannot form the basis of a civil cause of action against her.

Appellees[14] counter that (1) the claim for malicious prosecution stems from Vanessa coaching L.L. to make false outcries of abuse and (2) no case has held the judicial-proceedings privilege defense applies to malicious prosecution or other non-defamatory type claims or to defamatory claims that did not occur in court.

## A. Application of judicial-proceedings privilege defense to Appellees' claims

First, Appellees reframe their argument on appeal to suggest that the premise was that Vanessa was coaching L.L. to make the abuse allegations. However, at trial, Appellees' malicious prosecution claim was premised on their argument that Vanessa did not have a good-faith basis for the statements she made in her affidavits and she engaged in malicious civil prosecution against them when she initiated or continued administrative proceedings with CPS and HHS. Their abuse of process claim was premised on their argument that Vanessa made the statements to separate Leith from his children via the temporary restraining order and the protective order. To the extent "coaching" L.L. was mentioned at trial, it is clear from the record that Appellees relied on the allegation as a basis for their argument that Vanessa lacked a good-faith basis for her statements.[15]

Second, the judicial-proceedings privilege is an absolute privilege that covers "any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *Landry's, Inc. v. Animal Legal Def. Fund*,

---

[14] In a single sentence with no further elaboration, Appellees contend Vanessa failed to object to any evidence based on a claim of immunity during trial. They cite to the portion of the trial transcript where their attorney asked that Vanessa's affidavits be admitted into evidence. Under the circumstances of this case, we conclude Vanessa was not required to object based on immunity because the affidavits formed not only the basis of Appellees' claims against her but also were relevant to both her immunity defense and her defense to the merits of the claims against her.

[15] In closing arguments, Appellees' counsel mentioned only twice an allegation that Vanessa coached L.L.: (1) "Because [someone] said . . . that Detective Zamora said they believe mother was doing her own investigation and coaching the child." and (2) "And Luis Ceballos told you, 'I thought she was coaching.'"

631 S.W.3d 40, 46 (Tex. 2021) (quoting *James v. Brown*, 637 S.W.2d 914, 916–17 (Tex. 1982)). Appellees cite to several cases for their argument that the privilege applies only to defamation lawsuits. *See id.* at 44 ("Attorneys who make such statements outside a judicial proceeding have many potential defenses to defamation liability, but the judicial-proceedings privilege and attorney immunity are not among them."); *Bird v. W.C.W.*, 868 S.W.2d 767, 768, 771 (Tex. 1994) (psychologist who examined child for signs of sexual abuse concluded father was the abuser by way of affidavit to the family court; Court held she subjected herself to liability for defamation unless a privilege attached to the form of the communication).

We reject Appellees' argument because none of the cases relied on by Appellees place such a limitation on the privilege. *See Landry's*, 631 S.W.3d at 46 ("Although commonly applied in defamation cases, the privilege prohibits 'any tort litigation based on the content of the communication' at issue.") (citation omitted); *Zidan v. Zidan*, No. 05-20-00786-CV, 2022 WL 17335693, at *9 (Tex. App.—Dallas Nov. 30, 2022, pet. denied) (mem. op.) (rejecting argument that privilege applied only to claims in which reputational damages are sought); *McIntyre v. Wilson*, 50 S.W.3d 674, 683 (Tex. App.—Dallas 2001, pet. denied) (concluding *Bird*'s analysis was simply made in the context of the specific proceeding and stating any analysis regarding defamation-type damages did not restrict its statement of law); *Griffin v. Rowden*, 702 S.W.2d 692, 694–95 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) ("reference to 'a civil action for libel or slander' was by way of description of the case before it—a libel suit—and not by way of limitation to civil actions for libel and slander only").

We conclude the judicial-proceedings privilege applies to torts other than defamation, including claims for malicious prosecution and abuse of process, "when the essence of the [tortious] claim is that injury occurred as the result of allegedly false statements made during a

27

judicial proceeding." *de Mino v. Sheridan*, No. 14-05-00210-CV, 2006 WL 1026933, at *2 (Tex. App.—Houston [14th Dist.] Apr. 20, 2006, pet. denied) (mem. op.) (citing *Bird*, 868 S.W.2d at 771–72); *see also Crain v. Unauthorized Practice of Law Comm. of the Sup. Ct. of Texas*, 11 S.W.3d 328, 335 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ("This Court has held that the judicial privilege is not limited to claims of libel or slander, and it should be applied to claims arising out of communications made in the course of judicial proceedings, regardless of the label placed on the claim."); *Hernandez v. Hayes*, 931 S.W.2d 648, 654 (Tex. App.—San Antonio 1996, writ denied) ("Although the privilege arises as a defense to defamation, it must be applied to all of appellant's causes of action. The privilege would be lost if the appellant could merely drop the defamation causes of action and creatively replead a new cause of action."). Therefore, we next address whether the judicial-proceedings privilege shields Vanessa from liability from Appellees' malicious prosecution and abuse of process claims.

### B. Statements made by Vanessa in her affidavits

Under the judicial-proceedings privilege, communications made in the due course of a judicial proceeding "will not serve as the basis of a civil action . . . regardless of the negligence or malice with which they are made." *Landry's*, 631 S.W.3d at 46 (quoting *James*, 637 S.W.2d at 916). The phrase "due course of a judicial proceeding" includes communications made "in serious contemplation of such a proceeding." *Id.* (citation omitted). As noted above, the privilege is an absolute privilege that applies to "any statement made by . . . parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case." *Id.* (quoting *James*, 637 S.W.2d at 916–17). The privilege also applies to statements made before a proposed judicial proceeding. *Id.* "The privilege facilitates the proper administration of justice by promoting 'full

28

and free disclosure of information . . . by participants in judicial proceedings.'" *Id.* (quoting *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex. 2015)).

Here, Vanessa filed the complained-of affidavits in her divorce proceeding: the first was attached to her divorce petition in which she requested a restraining order and the other two were attached to her applications for protective orders. Appellees do not dispute that these affidavits were filed in a judicial proceeding—the divorce case. Her statements made in the due course of a judicial proceeding are protected "regardless of the negligence or malice with which they [were] made." *Id.* (holding, "the privilege prohibits 'any tort litigation based on the content of the communication' at issue"); *Bird*, 868 S.W.2d at 772 (holding, "a privilege exists for communication of an alleged child abuser's identity in the course of a judicial proceeding whether the accusation was negligently made");[16] *Crain*, 11 S.W.3d at 335 ("Any communication, even perjured testimony, made in the course of a judicial proceeding, cannot serve as a basis for a suit in tort."); *Wilkinson v. USAA Fed. Sav. Bank Tr. Servs.*, No. 14-13-00111-CV, 2014 WL 3002400, at *6 (Tex. App.—Houston [14th Dist.] July 1, 2014, pet. denied) (mem. op.) ("The judicial proceedings privilege is 'tantamount to immunity'; where there is an absolute privilege, no civil action in damages for oral or written communications will lie, 'even though the language is false and uttered or published with express malice.'"). Therefore, we conclude the absolute privilege bars Appellees' malicious prosecution and abuse of process claims based on the statements Vanessa made in her affidavits.

---

[16] In *Bird*, a psychologist, Esther Bird, examined a child for signs of sexual abuse. After examining the child, Bird concluded the child had been sexually abused and the natural father was the abuser. Bird signed an affidavit reporting these conclusions, and the affidavit was filed by the child's mother in family court in an effort to modify child custody and visitation orders. All matters, criminal and civil, predicated upon the assertion that the natural father was a child abuser were eventually dropped. The natural father then sued Bird and her employer. In her defense, Bird argued the affidavit asserting the natural father to be the abuser of the child was used as a part of the court litigation process, and consequently, the statement was privileged as a matter of law. *Bird v. W.C.W.*, 868 S.W.2d 767, 768 (Tex. 1994).

## C. Statements made by Vanessa to CPS

"The rule that communications uttered or published in the course of a judicial proceeding are absolutely privileged, applies to proceedings before executive officers, and boards and commissions which exercise quasi-judicial powers." *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942); *see also Landry's*, 631 S.W.3d at 47 (holding privilege extends to the right of parties to communicate with a quasi-judicial body touching matters under its consideration, "just as such persons would have the right to communicate with a court"); *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 655 (Tex. 2015) ("In Texas, the absolute privilege is also extended to quasi-judicial proceedings and other limited instances in which the benefit of the communication to the general public outweighs the potential harm to an individual.").

"A proceeding is quasi-judicial in nature if it is conducted by a governmental executive officer, board, or commission that has the authority to hear and decide the matters coming before it or to redress the grievances of which it takes cognizance." *5-State Helicopters, Inc. v. Cox*, 146 S.W.3d 254, 257 (Tex. App.—Fort Worth 2004, pet. denied). "Even communications made in contemplation of or preliminary to a quasi-judicial proceeding are privileged if they concern a matter that the quasi-judicial body is authorized to investigate and decide." *Id.*

Appellees do not dispute, and we conclude that, CPS exercises a quasi-judicial function. "Quasi-judicial actions include discretionary acts such as gathering information in connection with an investigation and making decisions based upon that information." *Gonzalez v. Avalos*, 866 S.W.2d 346, 349 (Tex. App.—El Paso 1993), *writ dism'd w.o.j.*, 907 S.W.2d 443 (Tex. 1995) (per curiam) (holding CPS supervisor's position with HHS was quasi-judicial because he was required to make decisions and exercise discretion as to the extent of investigations and the priorities to be given reported child abuse cases); *see also Lubbock-Crosby Cnty. Cmty. Supervision & Corr.*

*Dep't v. Lance*, No. 07-14-00222-CV, 2014 WL 7369938, at \*6 (Tex. App.—Amarillo Dec. 22, 2014, no pet.) (mem. op.) ("CPS acts in a quasi-judicial capacity when it conducts its investigations[.]").

The only statements attributed to Vanessa are those contained in the CPS report when she was interviewed by those investigating the reports of outcries. However, both Martinez and Ceballos stated that the law prevents them from identifying the person who reported the outcry and nothing in the CPS report identified Vanessa as the person who made the initial report of child abuse against Leith, Laboe, or Three R's. We conclude Vanessa's statements contained in the CPS report were submitted during quasi-judicial proceedings; therefore, the absolute privilege bars Appellees' malicious prosecution and abuse of process claims based on the statements Vanessa made during the CPS investigations.

For these reasons, we sustain Vanessa's first issue on appeal.

## V. CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE

Although we conclude absolute privilege bars Appellees' malicious prosecution and abuse of process claims based on the statements Vanessa made in her affidavits and during the CPS investigations, we next examine the record to determine if other evidence exists to support those claims. In her second and third issues, Vanessa challenges the legal sufficiency of the evidence in support of the jury's findings on Leith and Laboe's malicious prosecution and abuse of process claims.

### A. Standard of review

The trial court did not make findings of fact and conclusions of law; therefore, all facts necessary to support the judgment and that are supported by the evidence are implied. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Escalante v. Escalante*,

31

632 S.W.3d 573, 578 (Tex. App.—El Paso 2020, no pet.). However, when, as here, the appellate record includes the clerk's and reporter's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency of the evidence. *Marchand*, 83 S.W.3d at 795. We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017).

We defer to the factfinder's determination of the credibility of the witnesses and the weight of their testimony. *Kiehne v. Jones*, 247 S.W.3d 259, 263 (Tex. App.—El Paso 2007, pet. denied). We may not substitute our judgment for that of the factfinder. *Arcides v. Rojas*, 677 S.W.3d 154, 159 (Tex. App.—El Paso 2023, no pet.). "The trier of fact has several alternatives available when presented with conflicting evidence." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). It may believe one witness and disbelieve another, and it may resolve inconsistencies in the testimony of any witness. *Id.*

In reviewing a legal sufficiency challenge to the evidence, we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). A legal sufficiency challenge will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810; *Fibela v. Wood*, 697 S.W.3d 314, 319 (Tex. App.—El Paso 2023, no pet.). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no

evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). "[A] number of inferences may be drawn from a single fact situation." *Zavala v. Burlington N. Santa Fe Corp.*, 355 S.W.3d 359, 372 (Tex. App.—El Paso 2011, no pet.). "However, an inference stacked only on other inferences is not legally sufficient evidence." *Id.* "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

## B. Abuse of process

Abuse of process is the malicious use or misapplication of process to accomplish an ulterior purpose. *Moore v. Bushman*, 559 S.W.3d 645, 652 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Leith and Laboe had to plead and prove that (1) Vanessa made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process; (2) Vanessa had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process; and (3) damage resulted to the plaintiffs as a result of such illegal act. *Blanton v. Morgan*, 681 S.W.2d 876, 878 (Tex. App.—El Paso 1984, writ ref'd n.r.e.).

"It is critical to a cause of action for abuse of process that the process be improperly used *after* it has been issued." *Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *see also Moore*, 559 S.W.3d at 653 ("Implicit in the elements is the requirement that the process in question be improperly used after it was issued."). "In other words, the tort assumes that the original issuance of a legal process was justified, but the process itself is subsequently used for a purpose for which it was not intended. *Moore*, 559 S.W.3d at 653; *see also Davis v. West*, 433 S.W.3d 101, 111 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ("A suit for abuse of process must be based on an allegation that the other party misused process for a collateral purpose[.]").

The focus of an abuse of process claim "is on the use of the process once it is properly obtained, not on the motive for originally obtaining the process." *Davis*, 433 S.W.3d at 110. "When the process is used for the purpose for which it is intended, even though accomplished for an ulterior motive, no abuse of process has occurred." *Moore*, 559 S.W.3d at 653; *see also Bossin*, 894 S.W.2d at 33 ("Texas has generally recognized a cause of action for abuse of process where the original process, such as a writ, has been abused to accomplish an end other than that which the writ was designed to accomplish."). "A claim based on the filing and maintaining of a lawsuit and the obtaining of a temporary restraining order cannot constitute abuse of process, because abuse of process refers to the improper use of the process after it has been issued." *Spencer v. Overpeck*, No. 04-16-00565-CV, 2017 WL 993093, at *6 (Tex. App.—San Antonio Mar. 15, 2017, pet. denied) (mem. op.); *accord Kute Bar, LLC v. Tran*, No. 02-24-00119-CV, 2024 WL 4562500, at *5 (Tex. App.—Fort Worth Oct. 24, 2024, no pet.) (mem. op.) (quoting *Spencer*, 2017 WL 993092, at *6).

In her third issue on appeal, Vanessa asserts there is no evidence (1) of an illegal, improper, or perverted use of process or (2) of an ulterior motive or purpose in using the process. The jury charge asked the jury if Vanessa "commit[ed] abuse of process when she obtained the restraining order or subsequent protective order against Leith Labrado[.]" The charge also asked if Vanessa "commit[ed] abuse of process when she obtained the protective order against Laboe Labrado[.]" Therefore, Leith and Laboe base their abuse of process claims on Vanessa obtaining a restraining order and protective order against Leith and a protective order against Laboe. On appeal, Leith contends the purpose of the restraining order and protective order was to permanently deprive him

of his children.[17] Laboe contends the purpose of the protective order against him was to permanently deprive him of seeing his niece and nephew.

Vanessa sought a restraining order for the purpose of prohibiting Leith from picking up the children from their school or daycare. On November 14, 2019, the trial court issued an ex parte temporary restraining order against Leith that restrained him from, among other things, "taking [L.L.] and/or [E.L.] into his possession, at any time" and from withdrawing them from enrollment in their respective school or day care. Vanessa sought the protective orders against Leith and Laboe to, among other things, prevent them from communicating and/or harming L.L.; and as to Leith, to prohibit him from removing L.L. and E.L. from Vanessa's possession. On December 6, 2019, the trial court issued the temporary ex parte protective orders against Leith and Laboe prohibiting them from, among other thing, (1) committing family violence; (2) committing abuse of a child of the family or household; (3) communicating directly with L.L. in a threatening or harassing manner; (4) communicating a threat through any person to L.L.; (5) communicating in any manner with L.L. except through Leith's attorney or a person appointed by the trial court; (6) engaging in conduct directed specifically toward L.L., including following L.L., that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass L.L., (7) going to or near, or within 200 yards of, any location where L.L. is known by them to be and from remaining within 200 yards after they become aware of L.L.'s presence; and (8) going to or near the residences or school of L.L. The temporary ex parte protective order against Leith also prohibited him from removing L.L. and E.L. from Vanessa's possession.

---

[17] At trial, he testified Vanessa told him she knew "the attorneys, the CPS, [and the] police department" and she would take the children away from him so she could "live in peace."

Here, Leith and Laboe's abuse of process claims focus on Vanessa's use of the temporary restraining order and protective orders to allegedly deprive them of access to L.L. and E.L.[18] However, the abuse of process tort is concerned with the use of the process *after* it has been properly obtained, not on a defendant's motive for originally obtaining the process. Leith and Laboe have not shown how Vanessa improperly used the orders once they were obtained. Their allegations—even if true—that Vanessa obtained the orders to deprive them of access to the children are insufficient to satisfy the requirement that she made an illegal, improper, or perverted use of the process *after* it was issued. Instead, the record reflects that the orders were used for their intended purpose—to prohibit access to the children pending the outcome of later hearings[19]on the temporary orders, after notice to Leith and Laboe. *See Moore*, 559 S.W.3d at 653 ("When the process is used for the purpose for which it is intended, even though accomplished for an ulterior motive, no abuse of process has occurred."); *see also Bossin*, 894 S.W.2d at 33 ("If wrongful intent or malice caused the process to be issued initially, the claim is instead one for malicious prosecution.").

Even if Vanessa had an ulterior motive for obtaining the temporary ex parte orders, there is no evidence she made an illegal, improper, or perverted use of the orders *after* they issued.

---

[18] In their petition, Leith and Laboe stated "they were served with valid process and as parties to the Divorce Case and protective order case(s)[.]"

[19] The November 14, 2019, ex parte temporary restraining order set December 6, 2019 for a hearing to determine, among other things, whether the temporary restraining order should be made a temporary injunction pending final hearing, whether Vanessa should be appointed temporary sole managing conservator of the children, and whether Leith should be denied access to the children or, alternatively, the trial court should render a possession order providing that his periods of visitation be continuously supervised. The December 6, 2019, temporary protective orders set January 2, 2020 for a hearing to determine whether the court should enter protective orders under the same terms. The record does not contain any further orders and, at trial, Leith and Laboe relied only on the 2019 temporary ex parte orders.

Because we conclude there is no evidence on at least one of the elements of the abuse of process claims, we sustain Vanessa's third issue on appeal.

### C. Malicious prosecution

Under their claim for civil malicious prosecution, Leith and Laboe had to plead and prove: (1) the institution or continuation of civil proceedings against them; (2) by or at the instance of Vanessa; (3) malice in the commencement of the proceedings; (4) lack of probable cause for the proceedings; (5) termination of the proceedings in their favor; and (6) special damages. *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 207 (Tex. 1996); *Blanton*, 681 S.W.2d at 878. In her second issue on appeal, Vanessa asserts there is no evidence that (1) civil proceedings were commenced against Leith and Laboe by virtue of the CPS investigation, (2) civil proceedings were instituted or continued at her insistence, and (3) either Leith or Laboe suffered special damages because of the investigations.

The jury charge asked the jury if Vanessa "engage[d] in malicious civil prosecution against [Appellee] when she initiated or continued administrative proceedings with Texas Child Protective Services and the Texas Health and Human Services Daycare Licensing Board[.]" Therefore, Leith and Laboe base their malicious prosecution claims on the investigations conducted by CPS and HHS.

We first note there is no evidence that Vanessa initiated the CPS investigation. Although the CPS report does not name the individual(s) who made any report of an outcry, there is no dispute that Richard reported the first outcry about alleged abuse of L.L. by D.D. and N.D. to CPS in November 2019. This report initiated the civil proceedings by CPS. Leith admitted the initial allegations made to CPS did not pertain to him, but involved allegations that D.D. and N.D., had twisted L.L.'s arm behind his back and grabbed his genitals. Nevertheless, for the first time on

37

appeal, Leith and Laboe assert their claim for malicious prosecution arises from Vanessa allegedly coaching L.L. to make false claims of abuse.

As we noted above, at trial, Leith and Laboe's malicious prosecution claim was premised on their argument that Vanessa did not have a good-faith basis for the statements she made in her affidavits and she engaged in malicious civil prosecution against them when she initiated or continued administrative proceedings with CPS and HHS. To the extent coaching L.L. was mentioned at trial, it is clear from the record that they relied on the allegation as a basis for their argument that Vanessa lacked a good faith-basis for her statements.

Assuming the jury believed the contention that Vanessa coached L.L. to make an outcry, the jury would then have had to infer (1) she coached L.L. to make his November 2019 outcry about N.D. and D.D. and (2) coached L.L. or persuaded L.L. to make the outcry to Richard. Regarding whether Vanessa coached L.L. to make outcries about Leith or Laboe, the only statements in the record about alleged coaching make no mention of (1) what outcry or outcries were coached or when the alleged coaching occurred in relation to a specific outcry.[20] Therefore, the allegations that Vanessa coached L.L., which in turn led to the initiation of proceedings against Leith and Laboe, amount to no more than surmise and suspicion.

As to whether evidence exists in the record that the civil proceedings were continued at Vanessa's insistence, Leith testified Vanessa made allegations against him, but he did not elaborate on the nature of the allegations. Laboe testified HHS initiated an investigation into him and/or

---

[20] Following are the only times "coaching" is mentioned in the record. Flores's CPS report stated: "After CCL, Luis and I consulted with CAC, detective Zamora, we were informed that Zamora was aware of the allegations, and believes the family is going through a bad custody divorce. CAC, Detective Zamora, at this point in the investigation believes mother may be doing her own investigation and coaching child, Lucca, to keep full custody of the child." Flores testified he did not believe he documented the statement about Vanessa doing her own investigation or coaching L.L. in the report. Ceballos testified that, based on his investigation and his interactions with Zamora and Flores, his opinion was that Vanessa was possibly coaching L.L.

Three R's based on a "claim" made by Vanessa, but he did not elaborate on the "claim." We conclude this testimony "offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred*, 650 S.W.2d at 63.

Furthermore, even if the jury believed Leith and Laboe's testimony, other individuals made reports of outcries. Kasmoch testified she reported an outcry L.L. made to her on March 6, 2020, during one of her sessions with him and an outcry made to Lourdes by L.L. was reported in April 2020. Ceballos testified the HHS investigation resulted from the April 2020 outcry made to CPS. According to Flores, this investigation involved an outcry L.L. allegedly made to Lourdes about abuse by Leith and Laboe that occurred at Three R's. Therefore, because the CPS and HHS investigations continued based on outcries made to other individuals, we conclude there is no evidence that civil proceedings were continued only at Vanessa's insistence. Because there is no evidence on at least one of the elements of the malicious prosecution claims, we sustain Vanessa's second issue.

## VI. Conclusion

For the reasons stated above, we reverse the trial court's judgment and render judgment that Leith Labrado and Laboe Labrado take nothing on their claims against Vanessa.[21]

MARIA SALAS MENDOZA, Chief Justice

October 31, 2025

Before Salas Mendoza C.J., Palafox and Soto, JJ.
Soto, J., concurring and dissenting

---

[21] Because we sustain Vanessa's first, second, and third issues, we do not address the other arguments raised on appeal. *See* Tex. R. App. P. 47.1.